[S. F. Nos. 18593, 18640. In Bank. Feb. 24, 1954.]

THOMAS W. GOWANLOCK et al., Respondents, v. JAMES TURNER, as Manager of Utilities, etc., et al., Appellants; JOSEPH ROBINSON, Intervener and Appellant.

Dion R. Holm, City Attorney (San Francisco), and A. Dal Thomson, Public Utilities Counsel, for Appellants.

Lamson, Jordan & Walsh for Intervener and Appellant.

Tobriner & Lazarus, Mathew O. Tobriner and Stanley H. Neyhart for Respondents.

EDMONDS, J.—Several employees of the municipal railway of the city and county of San Francisco, on behalf of themselves and all other employees similarly situated, sued for writs of mandate and for declaratory relief. Named as defendants are the manager of utilities of the public utilities commission, the members of the civil service commission and its secretary, and the controller. Joseph Robinson, on behalf of the taxpayers of the city and county, has filed a complaint in intervention in opposition to the employees' complaint.

By this action, the employees principally seek to obtain a determination as to their right to have work for certain minimum hours. One theory of the complaint, based upon section 125 of the charter of the city and county, is that every operating employee is entitled to receive compensation for a minimum of eight hours of work in each working day. An alternative theory is that section 151.3 of the charter, which establishes a method of computing wages based upon the wage schedules of certain other street railway systems, requires the consideration of any minimum wage guarantees included in such schedules.

According to the stipulated facts, the streetcars and coaches of the municipal railway are operated over designated routes on schedules arranged by the manager of utilities and approved by the public utilities commission. These schedules have "straight time" runs, which require the continuous services of an operator for a period which may be more or less than eight hours, and "split time" runs, during which there is a period when the operator is off duty. "Split time" runs vary in the number of hours worked as well as in their total elapsed time, termed "range time," which generally is less than 10 hours. Work assignments are made on the basis of selection by the employees, in order of seniority.

It is necessary from the standpoint of satisfactory operation of the municipal railway and a usual practice among street railways throughout the country to employ more operators than there are runs. Standby employees must be avail-

able in case of absences and to handle unforeseen demands for increased transportation facilities. The employees who supply these needs are those who, for one reason or another, do not have a regular run.

An extra employee is assigned to the division headquarters he selects. He is required to report at a designated time to a dispatcher who assigns him to the run of an absentee, or to a location at which he collects fares from passengers as they board a car or bus. In the event that no work is available, the dispatcher may designate a later report time, or he may dispense with the employee's services for that day.

An operator who is given no work on a particular day is entitled to compensation for the time he spent in reporting. Although some of the men on the extra list do not have work for eight hours each day, it is the policy of the manager of utilities to assign duties to the extent that, throughout the period of two weeks, each employee shall have received compensation equivalent to the wages he would have earned had he worked 40 hours per week.

The present action primarily concerns these extra men. However, the complaint indicates that it is intended to present the rights of some of the operators assigned to regular runs of less than eight hours per day.

Five causes of action were pleaded. Two of them were determined adversely to the employees in the trial court and they are no longer in issue.

In the first count, based upon section 125 of the city charter, the employees seek a writ of mandate to compel the manager of utilities to approve and transmit to the civil service commission payrolls crediting each employee with a minimum of eight hours of work for each working day. By the fourth count, they ask the court to compel the civil service commission to certify to the board of supervisors a wage schedule which guarantees minimum wages and hours of employment for the operating personnel. The fifth count reiterates the allegations of the preceding ones and seeks a declaratory judgment in accordance with them. The appeal of the city officials and the intervener is from a judgment in favor of the employees upon each of these causes of action.

The appellants take the position that section 125 of the charter provides only a formula for the payment of overtime and does not establish maximum or minimum hours of work. Furthermore, they argue, the judgment is too uncertain in its terms to be capable of enforcement. The respondent

employees are without standing to bring this action, the appellants also assert, and the city officials named in the judgment are not the proper parties against whom such a judgment may be given.

Since 1925, section 125 of the charter has read in part as follows: "Persons employed as platform men or bus operators in the operating department of the municipal railway system shall be subject to the following conditions of employment: The basic hours of labor shall be eight hours, to be completed within ten consecutive hours; there shall be one day of rest in each week of seven days; all labor performed in excess of eight hours in any one day, or six days in any one week, shall be paid for at the rate of time and one-half." According to the respondents, this provision guarantees the employees eight hours of work within a range of 10 hours upon six days of each week, with pay for eight hours even if the work assignment is for less than that time on any particular day. The city contends that the only purpose of section 125 is to specify the rate of pay for all hours in excess of eight within 10 hours and for those worked after the expiration of 10 hours in any one day.

The charter provision does nothing more than to specify the basis of compensation for employees. It declares that overtime shall be paid for all work done after eight hours and also after the lapse of 10 hours of actual service. Labor performed in excess of six days in any one week must be paid for at the rate of time and one-half.

■ The requirements of a statute are directory, not mandatory, unless means be provided for its enforcement. ■ The charter includes no means of enforcing the requirement that all labor performed in excess of eight hours in any one day, all labor performed after the span of 10 hours in any one day, and all labor performed in excess of six days in any one week "shall be paid for at the rate of time and one-half." No requirement is laid upon the city to pay for eight hours of work on a given day or 48 hours per week regardless of the duties performed.

The same construction was placed upon a federal statute which declared that "eight hours shall constitute a day's work for all laborers, workmen, and mechanics now employed, or who may be hereafter employed, by or on behalf of the government of the United States." (Act of June 25, 1868, ch. 72; 15 Stats.L. 77.) This legislation, said the court,

constituted only a direction by the government to its agents, and not a prohibition of the making of contracts which fixed a different length of time for daily service; "the government officer is not prohibited . . . from agreeing, when it is proper, that a less number of hours than eight shall be accepted as a day's work." (*United States* v. *Martin*, 94 U.S. 400, 403 [24 L.Ed. 128].) A Massachusetts law was similarly interpreted. (*Woods* v. *City of Woburn*, 220 Mass. 416 [107 N.E. 985, Ann.Cas. 1917A 492].)

The respondents rely upon *Chatfield* v. *City of Seattle*, 198 Wash. 179 [88 P.2d 582, 121 A.L.R. 1279]; *Goss* v. *Justice of District Court of Holyoke*, 302 Mass. 148 [18 N.E.2d 546]; and *Graham* v. *City of New York*, 167 N.Y. 85 [60 N.E. 331]. The opinion in none of them states the language of the statute or ordinance being considered, and the court's conclusions necessarily were based upon the legislation before it.

In 1924 and 1925, when section 125 of the charter was amended, section 33 of article XVI declared: "No deputy, clerk, or other employee of the City and County shall be paid for a greater time than that covered by his actual service."[1] It is reasonable to conclude that if the purpose of the proponents of the amendment was to change that basic provision, the new section would have so stated in no uncertain terms. The failure to do so shows a legislative intent to specify a basis of compensation for railroad workers not in conflict with the existing mandate of the charter prohibiting payment for service not performed.

Another provision of the old charter provided for the wages and hours of labor of employees of railroads which operated under franchises granted by the city and county. It read: "Every franchise shall provide that employees of the person or company or corporation operating a street railroad shall be paid not less than three dollars a day and that eight hours shall be the maximum hours of labor in any calendar day, the same to be completed within ten hours; *provided*, that nothing in this section shall be construed to prohibit overtime employment, wages for such employment to be paid at one and one half times the said rate of wages proportionate

[1]Section 33 was a part of the former charter from its inception (Stats. 1899, ch. 2 of Res., p. 241, at p. 364) and continued therein, unchanged, until that charter was superseded by the new charter in 1932. It was carried into section 150 of the new charter, enlarged to include officers. (Stats. 1931, ch. 56 of Res., p. 2973, at p. 3066.)

to each hour of such extra service.''[2]  (Art. III, ch. 2, § 7b.)
This section in clear and unmistakable terms specifies a mini-
mum wage and maximum hours of work, overtime employment
being allowed if paid for at time and one-half.  With these
requirements laid upon railways privately owned, the omis-
sion from the 1925 amendment of similar provisions in regard
to the municipal railway may well be taken as evidence that
the new proposal was not intended to guarantee either a
particular amount of wages or a work day of a given number
of hours.

The city officials in charge of the municipal railway con-
sistently have operated it with an administrative interpreta-
tion of the charter as prescribing no guarantee of wages or
hours of labor.  At the time the amendment was adopted,
the superintendent of the railway submitted a report to the
board of public works, then in charge of its operations, giving
an estimate of the railway's needs in terms of personnel
and wages.  Shortly thereafter, at the superintendent's re-
quest, the president of Local 518, one of the sponsors of the
amendment, submitted a written analysis of it in which he
described the enactment as providing only a basis for com-
pensation.[3]

Following this correspondence, a number of conferences
were held, attended by city officials and representatives of
the men.  At that time the city attorney rendered an opinion

---

[2]Added to the charter by the Statutes of 1911, ch. 25 of Res., p. 1661,
at p. 1694.  It continued unchanged during the life of the former charter.
It was a part of that charter in 1924 and 1925.

[3]''Our interpretation of the . . . [amendment] and also the opinion
of legal minds with whom we have consulted is that the stipulations
contained therein merely provide a basis of compensation and do not
prevent the performance of any labor beyond the limitations described.
   ''Supplementary to our opinion we refer you to the Adamson Eight
Hour Law for Trainmen which while not identical, is in many respects
similar to Charter Amendment No. 21.
   ''We might also refer you to employment in many industries where
the hours of labor must be stretched over a range that will supply the
requirements of all concerned; in which event, the employer is subject
to a penalty similar to that affixed by Amendment No. 21.
   ''As an illustration of our opinion as to how the law would apply
where the ten hour limit as set forth in the Amendment has been exceeded
. . . the crew working run [15A] shall be paid straight time for work
actually performed . . . 7 hours and 5 minutes, and, for all work actually
performed beyond the ten hours range, which [will be] . . . 47 minutes,
they shall be paid at the rate of time and one-half of one hours and
eleven minutes; making a total of 8 hours and 16 minutes.
   ''The other feature of the amendment relative to one day of rest in
seven may be construed in this manner.
   ''You will note that the amendment establishes eight hours as being

in which he said in part: "Most legislation limiting the hours of employees and restricting the number of days a week upon which labor may be performed, is adopted upon the theory that the shortening of time of labor promotes the health and comfort of the employe, and therefore, produces greater efficiency. But it is manifest from the very language of section 20 that it does not restrict the hours of labor for that reason. It creates a basic day and a basic week for the purpose of fixing compensation."

Shortly thereafter, the board of public works adopted a resolution directing the superintendent of the railway to arrange the schedules so that no platform man or bus operator would be employed on the seventh consecutive day (except men on the extra list who had worked less than 48 hours in six days; all work on the seventh day to be paid for at time and one-half) ; that a minimum of overtime would be required of an employee who worked eight hours in any given day; and to fix 11 hours as the maximum range to be used.

In 1932, the manager of the railway issued a bulletin which stated: "Commencing Monday, April 25, . . . no allowance will be made in the way of overtime for runs which extend beyond a range of ten (10) hours." This rule was revoked by a new bulletin issued in 1935 which allowed overtime "for runs which extend beyond a range of ten (10) hours."

William H. Scott, now general manager of the railway, testified that from 1917 until the creation of the present public utilities commission in 1932, he represented the railway in all labor negotiations. During that period of time, he said, he was never confronted with any demands based upon a guaranteed eight-hour day. The first time such a demand was made by any employee of the railway was in the spring of 1949.

From 1932 to 1945, Edward G. Cahill was manager of utilities. In that capacity it was his duty to certify payrolls of the railway. He testified that the 1932 bulletin did not come to his attention until sometime after its issuance, and

---

the basic day and that therefor an employee working less than eight hours in any one day is not subject to this portion of the Amendment and may be permitted to work on the seventh day at straight time.

"This may continue until such employee has worked 208 hours which is equivalent to 26 eight hour days, after which, the overtime rate shall prevail.

"Providing that the time consumed in putting in the 208 hours shall have exceeded 26 days in one month."

late in 1934 he was approached by union representatives concerning it. After investigation he recommended to the public utilities commission that it be changed. The bulletin of 1935 was then issued.

During those discussions with the union representatives, Cahill said, no claim was made by them that the men were entitled to an eight-hour day by virtue of the charter provision. Henry S. Foley, employed by the municipal railway for approximately 33 years preceding 1951, was one of those representatives. According to his testimony, in 1946 the city and county controller notified the railway management they would have to discontinue paying for "dead time"; at that time operators whose runs finished within 15 minutes of eight hours were paid for the full eight hours. Subsequently, Foley requested reinstatement of the practice of allowing eight hours' pay for such runs.

William H. McRobbie, who has been an employee of the municipal railway for a number of years and a member of the same union as Mr. Foley, testified as to negotiations with city officials concerning the wage schedules. A committee of which he was a member met the mayor and the city attorney and discussed the question as to the legality of payment for work performed in excess of 10 consecutive hours. At that time, McRobbie said, the city attorney orally stated that, in his opinion, payment for such services was a legal charge against the city. Two weeks later, the 1935 bulletin restoring range time was issued. Asked if at that meeting there was any assertion that the men, by virtue of the charter, were afforded a guarantee of eight hours a day, he said, "No, there was no assertion that . . . all the men would be guaranteed eight hours a day; however, we did contend that the regular runs should be eight hours and any work performed in excess of the ten hours spread should be paid for at the rate of time and a half; that was all that was discussed."

The employees attach some significance to two items which they suggest show an administrative interpretation in favor of an eight-hour guaranteed workday. In March, 1935, the superintendent of the municipal railway wrote a letter to the then acting mayor of San Francisco in regard to the provisions of the new amendment to the charter. In estimated costs for an average month, the superintendent included: "Cost for time allowed for runs under eight hours, $2,898.23. This item does not enter into Amendment 21." The city explains this statement as having reference to man-

agement's established practice prior to 1946 of paying a full eight hours' pay for a regular run of seven hours and 45 minutes. This seems to be the only reasonable inference that can be drawn from the statement in view of the low amount stated, and the interpretations of the amendment by the city attorney and by the president of Local 518 at about the same time.

The second item consists of an unsigned memorandum dated September 4, 1925, entitled "Municipal Railway, San Francisco, data re working conditions of platform men." This memorandum was prepared in response to a written request from another transit company and consists of a short summary of working conditions before and after the effective date of the amendment to the charter. The memorandum includes the following: "Previous to Charter amendment, schedules were made out on an eight hour day with no limits as to range, except that they were kept as near ten hours as possible. All *regular* runs under eight hours were paid full eight hours and time and one-half was paid for all time beyond eight hours and twenty minutes. Number of hours after Charter amendment 21? Conditions same as above, except that overtime is paid after eight hours instead of after eight hours and twenty minutes, and one [and one-] half time is also allowed after the ten hour range. . . ." (Emphasis added.) The statement concerning eight hours' pay for all regular runs should be read in the light of the practice then in force of treating a regular run of seven hours and 45 minutes as the equivalent of a full eight hours regular run. Certainly, this does not support the finding that the "administrative construction adhered to throughout the years of Section 125 of the Charter is not in contravention of petitioner's construction."

The respondents contend, however, that even if section 125 does not guarantee to them a minimum working day, they are entitled to it under section 151.3[4] which requires that

[4]The portion of the section relating to municipal railway employees provides:

"Notwithstanding the provisions of section 151 or any other provisions of this charter the wages of platform employees and bus operators of the municipal railway shall be determined and fixed, annually, as follows:

"(A) On or before the second Monday of July of each year the civil service commission shall certify to the board of supervisors the two highest wage schedules in effect on July 1st of that year for platform employees and bus operators of other street railway systems in the State of California;

"(B) The board of supervisors shall thereupon fix wage schedules for

the wages of platform employees and bus operators of the municipal railway be fixed annually at the average of "the two highest wage schedules in effect on July 1st of that year for platform employees and bus operators of other street railway systems in the State of California." It is argued that "the average of the two highest wage schedules" includes the right to receive any guarantee of wages or hours included in such schedules.

The whole of section 151.3 is a qualification of section 151, which empowers the board of supervisors "to fix by ordinance from time to time . . . all salaries, wages and compensations . . . of all officers and employees" of the city and county. According to section 151.3, where there is established "a rate of pay for . . . groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco," the civil service commission must certify to the board of supervisors the prevailing rates. "The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly."

But the wages of the employees of the municipal railway cannot be fixed by that formula. For some years, nearly all of the public transportation service in San Francisco has been performed by the municipal railway, and, accordingly, there was no "prevailing rate of pay" established for street railway employees within the city and county. To set up a standard of wages, the second part of section 151.3 was added to provide a method of computing compensations based

platform employees and bus operators of the municipal railway which shall be the average of the two highest wage schedules so certified by the civil service commission; provided, if the average of the two highest wage schedules shall be less than the rates of pay fixed for such service in the salary standardization ordinance adopted by the board of supervisors on March 18, 1946, the board of supervisors shall fix wage schedules for such service which shall be the same as the rates fixed for such service in the said ordinance;

"(C) When, in addition to their usual duties, such employees are assigned duties of instructors of platform employees or bus operators they shall receive twenty (20c) cents per hour above the rates of pay fixed for platform employees and bus operators as herein provided;

"(D) The rates of pay so fixed for platform employees and bus operators as herein provided shall be effective from July 1st of the fiscal year in which such rates of pay are certified by the civil service commission;

"(E) Platform employees and bus operators shall be paid one and one-half times the rate of pay fixed as herein provided for all work performed on six days specified as holidays by ordinance of the board of supervisors for such employees."

upon the average of the two highest wage schedules of other street railways in California. In effect, this portion of section 151.3 represents a further qualification of the general structure of wage and pay determinations, applicable to a specific group of employees of the city and county.

The appellants draw a distinction between the two portions of section 151.3 from the use of the term "rate of pay" in the earlier part, as distinguished from "wages" and "wage schedules" in the portion relating specifically to municipal railway employees. Although a distinction between those terms has been made (see *Giannettino* v. *McGoldrick*, 295 N.Y. 208 [66 N.E.2d 57, 59]; *Jung* v. *City of New York*, 76 N.Y.S.2d 235), clearly it was not intended here. The provisions relating to municipal railway employees use both "rate of pay" and "wages," apparently interchangeably. (*Cf.* subsections B, C, D, and E.) Both parts are aimed at providing standards of compensation for particular groups of city and county employees, and vary only as to the methods used in determining them.

In *Adams* v. *Wolff*, 84 Cal.App.2d 435 [190 P.2d 665], the constitutionality of section 151.3 was upheld. There, the question before the court was whether, in determining prevailing rates of pay for groups and crafts, the civil service commission was required to include pay for holidays and premium pay for night work. It was argued by the city that the section contemplates only a basic rate of pay and was not intended to govern working conditions. The court said: "It is probably true that section 151.3 relates only to the 'basic' rate of pay and does not relate to 'working conditions.' But that in no way assists defendants. It is quite apparent that it was the intent of section 151.3 to give to the public employees of the type here involved the same take home pay received by private employees in the same industry. That means that when the public employees work on a night shift, or where a work week is interrupted by a holiday they are to receive the same pay that private employees would receive for work similarly performed. It is quite obvious that night shift pay and pay for holidays is a part of the 'basic' rate of pay, and is as much a part of the wage structure as the hourly wage itself." (Pp. 444-445.)

Subsequently, in *Adams* v. *City & County of San Francisco*, 94 Cal.App.2d 586 [211 P.2d 368, 212 P.2d 272], the court considered the question of whether, under the general provisions of section 151.3, the right of employees to vaca-

tions and to sick and disability leaves was to be governed by the "prevailing rate of pay" of similar groups and crafts in the industry. It was held that the right to sick and disability leave was governed by other specific sections of the charter. But, on the authority of *Adams* v. *Wolff*, the court concluded that vacation pay, too, is an item of take home pay as defined in the earlier decision.

In both of the Adams cases, the court equated "basic rate of pay" with "take home pay," but did not attempt to define either of those terms. It was recognized, however, that the apparent purpose of the section is to provide a method of computing the monetary remuneration to an employee, as distinguished from "fringe benefits," or benefits derived from working conditions. The difficulty lies in deciding whether a particular item is to be deemed "pay" or some other type of benefit.

By the use of the word "rate," the charter specifies a wage schedule made up by the measurement of one item on the basis of a unit or quantity of another.[5] As applied to wages, it requires a computation of amount of compensation for a unit of work, in the case of municipal workers, being an hourly wage.

It is unnecessary to decide whether the Adams cases were properly decided. Arguably, holiday pay and provisions for paid vacations might be considered to be items required to be included within a computation of "basic rate of pay," since ultimately, they have a bearing upon the amount of pay received for time actually worked, and sound accounting practice might require that they be so considered. However, at least insofar as municipal railway workers are concerned, specific provision for those items now is made by the charter. (§§ 151.3 [E], 151.4, 151.5.)

But a guarantee as to minimum hours of work does not affect the rate of an employee's pay, that is, the amount of compensation per unit of work. It deals only with the number of hours of work to which an employee may claim to be entitled. Such a provision is without the scope of a charter section establishing a method of computing a basic "rate of pay" for employees.

---

[5]Webster's New International Dictionary (2d ed. 1948) gives this definition of the word "rate": "3. Quantity, amount, or degree of a thing measured per unit of something else; . . . Amount of payment or charge based on some other amount, as in money obligations; as, the rate of wages per week; . . ."

▉ This conclusion is strengthened by consideration of the practical results of a contrary construction of the charter. By section 151.3, the wages of municipal railway employees must be computed annually on the basis of the two highest wage schedules of other street railways in California established as of July 1st of each year. By section 150, payments of wages for such guaranteed minimum hours may not be made to an employee who did not work for that amount of time. To pay each employee for a minimum of eight hours per day, it would be necessary to revise the entire operating schedule to provide work for such hours, and to revise it continually with every change in guaranteed hours of those wage schedules to which reference would be made. The evidence shows that, particularly in the case of extra men, such realignment of schedules would be extremely difficult and costly. Certainly there is no reasonable basis for holding that, in adopting the charter section, the people intended such a result.

▉ The respondents suggest that, instead of attempting to effectuate any specific guarantee of hours, the city officials should assign a monetary value to such a benefit and average it with the wages stated in the schedules consulted. Although they recognize that such a process would require "considerable consideration before an average could be struck between diverse systems of guarantees and diverse wage provisions," they assert that if the sole purpose of the section were "to add two rates of pay, divide by two, and then establish the result as the 'hourly rate of pay,' " there would be no need to entrust that function to the board of supervisors, the highest administrative agency of the city and county.

But if this contention were sustained, under like principles, the board should place a money value upon all other benefits received by employees under such schedules, and also upon similar benefits guaranteed under the charter of the city and county, and fix the wage schedule for the municipal railway accordingly. Such a construction of the section would impose the vast, if not impractical or impossible, burden upon the board of evaluating an endless variety of benefits. ▉ It is not unreasonable to construe the charter as placing upon the board a simple averaging process. It has the sole authority to fix wages and salaries and, although it generally is vested with wide discretion in computing them, section 151.3 is a direct limitation upon that power. Moreover, in the first part of section 151.3, the board is directed to revise the rates

of pay of groups of crafts in accordance with the rates certified to it by the civil service commission, under circumstances allowing no room for discretion.

In view of these conclusions, it is unnecessary to consider the points raised by the appellants in regard to procedural questions.

The judgment is reversed.

Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J., Concurring and Dissenting.—I adopt as my concurring and dissenting opinion in this case the able and well-reasoned opinion prepared by Justice Wood, which was concurred in by Justices Peters and Bray, when this case was before the District Court of Appeal, First Appellate District, Division One.

"The petitioners, permanent employees of the city and county of San Francisco, platform men and bus operators in the operating department of the municipal railway system, brought this action on their own behalf and on behalf of all other employees similarly situated, to determine a controversy over the interpretation and application of sections 125 and 151.3 of the city and county charter concerning hours of work and rates of pay of such platform men and bus operators.

"The action was brought against the manager of utilities of the public utilities commission of the city and county, members and the secretary of the civil service commission, and the controller of San Francisco. They were designated 'respondents,' below. Joseph Robinson, a taxpayer of San Francisco, intervened as a respondent on his own behalf, and on behalf of all taxpayers similarly situated.

"The complaint contains five counts. In the first four counts the petitioners seek writs of mandate; in the fifth count they pray for declaratory relief.

"The trial court found for the petitioners on counts one, four and five, and rendered judgment thereon in their favor. The respondents, including the intervener, have appeared from the judgment.[1]

"In addition to the major questions of interpretation, appellants present these questions: Is the judgment uncertain and

---

[1] Hereafter in this opinion, we will refer to the respondents as 'appellants' and to the petitioners as 'respondents' unless otherwise indicated.

contradictory in its several provisions? Are the respondents in a position, have they the legal right, to raise the questions which they present? Is there a legal basis for viewing this as a class suit? We will consider the major questions first.

"(1) *In respect to hours of service and overtime, section 125 of the charter* states that 'Persons employed as platform men or bus operators in the operating department of the municipal railway system shall be subject to the following conditions of employment: The basic hours of labor shall be eight hours, to be completed within ten consecutive hours; there shall be one day of rest in each week of seven days; all labor performed in excess of eight hours in any one day, or six days in any one week, shall be paid for at the rate of time and one-half.' (Stats. 1931, ch. 56 of Res., p. 2973, at 3050.)[2]

"This clause was first placed in the charter in 1925, by an amendment adding section 20 to article XII of the former charter. (Stats. 1925, ch. 10 of Res., p. 1159, at p. 1164.) It then read as now except that in the introductory portion the words 'shall receive' appeared where the words 'shall be subject to' now appear.

"*Respondents interpret this clause* as prescribing for them a workday of eight hours within a range of ten hours, guaranteeing them eight hours of work in ten hours upon six days of each week, and awarding them pay for the full eight hours in ten each day even if the work assignment on a particular day covers a shorter period, such as three, four, or six hours.

"*Appellants interpret this clause* as a formula for the payment of overtime (not as a guarantee of eight hours of work within a spread of ten each day), that it simply prescribes overtime pay (time and one-half) for all hours worked in excess of eight within ten hours and for all hours worked after the expiration of the ten-hour range regardless of the number of hours worked within the ten-hour range.

"*The trial court found and declared that this clause provides* 'that each petitioner and employee similarly situated should receive and be paid for eight hours of work in each scheduled working day, said eight hours of work to be completed within ten consecutive hours after commencement of work, and . . . that all labor performed in excess of eight hours in any one day shall be compensated for at the rate of time and one-half the rate of pay for such work.' (Finding IX, C.T. 71; Concl.

---

"[2]Subsequent amendments of § 125 have made no changes in this clause. (See Stats. 1941, p. 195, at 202; and p. 3250, at p. 3251.)

of Law, (a) substantially the same, C.T. 85); that the 'purpose and intent of section 125 was to enable the employees of the Railway to complete a day of eight hours of work within ten hours.' (Finding XX, C.T. 82; Concl. of Law, (k) C.T. 90.)

"The judgment directs the issuance of a writ of mandate commanding appellant Turner, Manager of the Public Utilities Commission of San Francisco, to approve and transmit to the appellant civil service commission time rolls or pay rolls showing 'that each petitioner and employee similarly situated is credited for at least eight (8) hours of work on each scheduled workday, in which each petitioner and employee similarly situated: (a) reports for work, and (b) performs each and every street car, bus or operating assignment designated within ten hours after reporting for said work . . .' (Judgment, (1) C.T. 94-95; follows Concl. of Law, (e), C.T. 86-87.) The judgment also declares that 'each petitioner and employee similarly situated is entitled to wages for at least eight (8) hours of work performed by each petitioner and employee similarly situated on each scheduled workday, in which each petitioner and employee similarly situated: (1) has reported for work, and (2) has performed each and every street car, bus or operating assignment designated within ten hours after reporting for said work' (C.T. 95; follows Concl. of Law, C.T. 85).

"*We do not find in this clause any guaranty of eight hours work per day, nor any guaranty of eight hours pay per day.* It is neither a minimum nor a minimum-maximum hour or wage per day provision.

"This clause is so clear and cogent in its wording, we find it difficult to express its meaning in other words than those which it uses. It starts with the statement: 'The basic hours of labor shall be eight hours, to be completed within ten consecutive hours.' Basic[3] for what? We may reasonably expect to find that out later on in the sentence. Without more, we have nothing but a formula: Eight hours in ten. Next it says, 'there shall be one day of rest in each week of seven days.' This, too, is a formula; one day in seven. Next come the words that give significance to these formulae. They tell us the use we must make of these formulae: 'all labor performed in

"[3]'Basic' means: Of or pertaining to the base or essence; fundamental; as, a basic fact; constituting a basis; as, a basic wage. (Webster's New International Dictionary, 2d ed.)

excess of eight hours in any one day, or six days in any one week, shall be paid for at the rate of time and one-half.' These formulae are to be used in ascertaining what is overtime. Use of the first formula indicates that labor performed 'in excess of eight hours in any one day,' comprehends all work done after the lapse of ten hours as well as all work done after eight hours of actual service. The second formula operates in similar fashion. All labor performed 'in excess of . . . six days in any one week [all work done on the day of rest],' must be paid for at time and one-half. With this, each formula exhausts its function. The charter requires no further use of it.

"Let us make another approach. It is a familiar principle of statutory interpretation that a declaration in a statute is directory, not mandatory, unless means be provided for its enforcement. The only means of enforcement here provided is the requirement that all labor performed in excess of eight hours in any one day, all labor performed after the span of ten hours in any one day, and all labor performed in excess of six days in any one week (all work done on the day of rest) 'shall be paid for at the rate of time and one-half.' Nothing is said about paying for labor not performed if a person's hours of work on a given day fall short of eight hours or fall short of eight hours within a span of ten or are less than 48 hours upon six days of a given week. We can but conclude that this clause was not intended to require payment for labor not performed, was not intended to guarantee eight hours of work per day, was not intended to guarantee eight hours of pay per day.

"Persuasive of this view is the interpretation made by the Supreme Court of the United States, of a federal statute which declared that 'eight hours shall constitute a day's work for all laborers, workmen, and mechanics now employed, or who may be hereafter employed, by or on behalf of the government of the United States.' (Act of June 25, 1868, ch. 72; 15 Stat.L. 77.) The court deemed this but a direction by the government to its agents and not a prohibition of the making of contracts which fixed a different length of time for a day's work. The court said 'the government officer is not prohibited . . . from agreeing, when it is proper, that a less number of hours than eight shall be accepted as a day's work.' (*United States* v. *Martin,* 94 U.S. 400, at 403 [24 L.Ed. 128] ; followed in 1915 by the Supreme Court of Massachusetts, in *Woods* v. *City of Woburn,* 220 Mass. 416 [107 N.E. 985, Ann.Cas. 1917A 492], interpreting a similar state

statute.) Respondents cite three cases in support of their interpretation of section 125. (*Chatfield* v. *City of Seattle,* 198 Wash. 179 [88 P.2d 582, 121 A.L.R. 1279] ; *Goss* v. *Justice of District Court of Holyoke,* 302 Mass. 148 [18 N.E.2d 546] ; and *Graham* v. *City of New York,* 167 N.Y. 85 [60 N.E. 331].) But those cases are not helpful. In none of them is the precise text of the significant provision of the salary and hours fixing statute or ordinance completely furnished. In the Goss case, none of it is furnished. In the Chatfield case only the hours per day feature ('Eight hours shall constitute a day's work'), not the wage feature, is given.. The decision as printed does not give that portion of the ordinance which implemented this declaration concerning hours of work. This declaration, standing alone, unaided by an enforcement feature, would be directory, not mandatory. There must have been something in the ordinance which made it mandatory. In the Graham case the court did not quote the statute. It did say that 'the salary was $1,200 a year, payable in equal monthly installments.' That bears no similarity to our section 125.

"Let us also examine the city and county charter as it read in 1924 and 1925, during the time when this amendment to that charter was written, presented to the voters of San Francisco, and considered and approved by the Legislature of the state.

"We find one feature of the charter which was particularly significant. Section 33 of article XVI declared: 'No deputy, clerk, or other employee of the City and County shall be paid for a greater time than that covered by his actual service.'[4]

"If the proponents of the 1925 amendment desired to require payment of eight hours of pay per day even though on a given day a fewer number of hours of labor be performed, they should have said so in no uncertain terms, in order to negative the prohibition of no pay 'for a greater time than that covered by his actual service' declared in section 33 of article XVI of the very charter being amended. The fact they did not do so is persuasive of the view that they harbored no intent to make such a requirement.

"Another provision of the old charter similarly serves as

[4]"Section 33 was a part of the former charter from its inception (Stat. 1899, ch. 2 of Res., p. 241 at p. 364) and continued therein, unchanged, until that charter was superseded by the new charter in 1932. It was carried into section 150 of the new charter, enlarged to include officers. (Stats. 1931, ch. 56 of Res., p. 2973, at p. 3066.)

an aid to interpretation. We refer to section 7b of chapter 2 of article III. It was one of a number of sections which dealt with street railway franchises granted by the city and county. They were added to the charter in 1911. Section 7b declared: 'Every franchise shall provide that employees of the person or company or corporation operating a street railroad shall be paid not less than three dollars a day and that eight hours shall be the maximum hours of labor in any calendar day, the same to be completed within ten hours; *provided,* that nothing in this section shall be construed to prohibit overtime employment, wages for such employment to be paid at one and one half times the said rate of wages proportionate to each hour of such extra service.'[5] Here we have in clear and unmistakable terms a minimum wage and maximum hours provision, followed by permission for overtime employment if paid for at time and one-half. With such a provision already in the charter, concerning street railways privately owned, its omission from the 1925 amendment, concerning street railways publicly owned, suggests that the sponsors of that amendment intentionally avoided, studiously avoided, writing into their proposal either a guaranteed wage or a guaranteed hours per day provision.

"Let us next consider the interpretation given this clause of the 1925 amendment by the officials charged with its administration, and by their legal adviser, before this controversy arose and this question reached the courts for consideration and determination.

"The concurrent resolution approving this amendment to the charter was filed with the Secretary of State, January 27, 1925 (Stats. 1925, p. 1159), and took effect on that date (Pol. Code, § 324; now Gov. Code, § 9602).

"Meanwhile (January 16, 1925), Superintendent F. Boeken reported to the board of public works (then in charge of the municipal railway) that schedules for all lines had been practically completed to meet the requirements of the new charter amendment. He estimated that of the 980 platform men required, 348 would be extra men, and estimated that the earnings of the latter would be reduced from $153 to $90 per month.

"Frank B. Halling, during that period, was president of Local 518 of the Amalgamated Street Railway Employees of

---

[5] Added to the charter by the Statutes of 1911, ch. 25 of Res., p. 1661, at p. 1694. It continued unchanged during the life of the former charter. It was a part of that charter in 1924 and 1925.

America. March 10, 1925, he wrote Superintendent Boeken, at the latter's request, giving his interpretation of the new amendment.[6] He said in part 'Our interpretation of the foregoing [§ 20 of art. XII of the charter] and also the opinion of legal minds with whom we have consulted is that the stipulations contained therein merely provide a basis of compensation and do not prevent the performance of any labor beyond the limitations described.

" 'Supplementary to our opinion we refer you to the Adamson Eight Hour Law for Trainmen which while not identical, is in many respects similar to Charter Amendment No. 21.

" 'We might also refer you to employment in many industries where the hours of labor must be stretched over a range that will supply the requirements of all concerned; in which event, the employer is subject to a penalty similar to that affixed by Amendment No. 21.

" 'As an illustration of our opinion as to how the law would apply where the ten hour limit as set forth in the Amendment has been exceeded we present a few examples where runs exceed said limit:

" 'Run 15-A, reports at 7:49 A. M. relieved at 11:19 A. M. first part; reports for second part at 2:14 P. M. and finishes at 6:36 P. M.

" 'Here you will find that from 7:49 A. M. until 5:49 P. M. is the ten hour range.

" 'The law provides that the crew working said run shall be paid straight time for work actually performed therein; which is in this instance, 7 hours and 5 minutes, and, for all work actually performed beyond the ten hour range, which in this particular case is 47 minutes, they shall be paid at the rate of time and one-half or one hour and 11 minutes; making a total of 8 hours and 16 minutes.

" 'Tripper runs would be treated in the same manner.

" '36-J, reports at 6:20 A. M. off at 8:37 A. M., reports for second part at 3:09 P. M. off at 6:03 P. M.

" '6:20 A. M. to 4:20 P. M. being the ten hour range, straight time prevails for all labor performed therein; which is 3 hours and 36 minutes, and the overtime rate prevails for labor performed between 4:20 P. M. and 6:03 P. M., which is 1 hour and 43 minutes; computed at the overtime rate is 2 hours and 34 minutes, making a total for this run of 6 hours and 11 minutes.

---

" [6] The parties stipulated that the San Francisco Labor Council was one of the sponsors of the 1925 amendment.

"'The other feature of the amendment relative to one day of rest in seven may be construed in this manner.

"'You will note that the amendment establishes eight hours as being the basic day and that therefor(e) an employee working less than eight hours in any one day is not subject to this portion of the Amendment and may be permitted to work on the seventh day at straight time.

"'This may continue until such employee has worked 208 hours which is equivalent to 26 eight hour days, after which, the overtime rate shall prevail.

"'Providing that the time consumed in putting in the 208 hours shall have exceeded 26 days in one month.'

"During March and the early part of April a number of conferences, attended by Superintendent Boeken and other city officials and representatives of the men, were held in an endeavor to work out a satisfactory method of operation under the new amendment. April 15, 1925, in response to a series of questions propounded by the board of public works, the city attorney rendered an opinion in which he said in part: 'Most legislation limiting the hours of employes and restricting the number of days a week upon which labor may be performed, is adopted upon the theory that the shortening of time of labor promotes the health and comfort of the employe, and therefore, produces greater efficiency. But it is manifest from the very language of section 20 that it does not restrict the hours of labor for that reason. It creates a basic day and a basic week for the purpose of fixing compensation. It is expressly declared:

"' '"The basic hours of labor shall be eight hours to be completed within ten consecutive hours; there shall be one day of rest in each week of seven days. All labor performed in excess of eight hours in any one day or six days in any one week shall be paid for at the rate of time and one-half."

"'Therefore, it was manifestly the intention of the framers of this section of the charter that the men should be allowed to work in excess of the basic hours, but that in the event that they did work they should receive extra compensation. It is meaningless to provide a restriction upon the hours of actual labor when in the same sentence, it is expressly declared that all labor performed in excess of eight hours in any one day or six days in any one week shall be paid for at the rate of time and one-half. The act forbidding females to work more than eight hours in twenty-four is direct and positive with no provision for the payment of any overtime

and prescribes a penalty for its violation. (Statutes 1911, page 437.) So are all similar acts prescribing the limitations upon the right to labor.'

"He was further of the opinion that the provision that 'the basic hours of labor shall be eight hours, to be completed within ten consecutive hours' did not prevent the persons referred to from performing their work within a period of time in excess of ten hours; also, that it would be lawful for a platform man who had worked 8 hours a day for six consecutive days, to work on the seventh day, and that the same was true of a man who worked less than 48 hours during that six day period; and that 'the employe is entitled under the said section to time and one-half for any and all time after the period of ten consecutive hours has elapsed during which time he has actually worked,' and 'the employe who works on the seventh day is entitled to time and one-half.'

"April 24, 1925, the board of public works adopted a resolution directing the superintendent of the railway to so arrange the schedules that no platform man or bus operator be employed on the seventh consecutive day (except men on the extra list who had worked less than 48 hours in six days; all work on the seventh day to be paid for at time and one half); to so arrange the schedules that a minimum of overtime would be required of an employee who worked eight hours in any given day; and to fix eleven hours as the maximum range to be used. In that resolution the board recited in part that 'the City Attorney in answer to the inquiries of this Board expresses as his opinion that the terms of the charter amendment recently ratified by the Legislature pertaining to the Municipal Railway, do not prohibit the employment of platform men or bus operators on the seventh consecutive day, nor in excess of eight hours in any given day, nor beyond a range of ten hours in any given day, provided that in case said employee is employed on said seventh day, or in excess of said eight hours, or outside a range of the said ten hours, he must be paid time and one-half therefor' and that "the amendment referred to was drafted and presented by the members of Division No. 518 of the Amalgamated Street Railways Employees of America, who were particular to have incorporated therein the following: "There shall be one day of rest in each week of seven days." '

"Thus, it appears that at the very beginning of operations under the new charter amendment in 1925, the officials charged with its administration and enforcement, their legal

adviser, and the representatives of the platform men and bus operators interpreted its provisions substantially the same as do the appellants herein.

"Has there been any material change in that interpretation, over the years, upon the part of the administrative officials? The evidence indicates there has been no such change. At the trial, the parties entered into a stipulation setting forth the significant facts concerning the establishment of routes for the operation of street cars and motor coach or trolley coach lines, the working schedule, runs necessary to service the routes, the 'general sign-up,' 'extra lists' of men, and other related matters, descriptive of the method of operating this railway as of the time of trial. The facts so stipulated reflect no change of administrative interpretation from that adopted early in 1925. The stipulation is too long for inclusion in this opinion. The following excerpt will serve to illustrate the administrative interpretation which the facts recited reflect: '(10) At the Geneva and Ocean Avenue Headquarters, all of the employees on the extra list are required to remain on report time, and during a time when a run is not yet available, and are paid for said period of time at the straight time rate for not less than two hours and for such additional time at said rate as may be required by the Dispatcher for report time. . . . [Similar provisions concerning other headquarters] . . . On occasions, it occurs that a man on the extra list at one Headquarters is needed at another, in which event said man is sent by Management from the former to the latter, with his traveling time compensated for at the legal rate; (11) Some of the men on the extra list are not afforded an opportunity by the Municipal Railway to work eight hours a day. The management of said Railway, including Respondent Turner and the Public Utilities Commission of the City and County of San Francisco, have, for some time last past, maintained and now pursue the policy of providing for work for men upon the extra list to the extent that each man thereon obtains a minimum, throughout a period of two weeks, of pay representing forty hours per week, although said man (referring to "some of the men," as above stated in line 23), are ready and desirous of working eight hours a day.'[7]

---

[7] The evidence shows a marked unevenness in rider demand each day. It is extremely high in the morning between 7:20 and 8:40 and in the evening between 4:55 and 5:30. In consequence, by 7 p. m. two-thirds of the equipment is withdrawn from service and by midnight demand is extremely low.

"Concerning the continuity of administrative interpretation over the years, 1925-1951, some evidence was adduced at the trial. April 23, 1932, Fred Boeken, manager of the municipal railway, issued a bulletin which stated: 'Commencing Monday, April 25, 1932, no allowance will be made in the way of overtime for runs which extend beyond a range of ten (10) hours.' April 29, 1935, these provisions were revoked by a new bulletin issued by the manager, reading as follows: 'Commencing Wednesday, May 1, 1935, overtime will be allowed for runs which extend beyond a range of ten (10) hours.' William H. Scott, now general manager of the municipal railway (from 1913 to 1935 he was auditor) produced the record which contained these bulletins. He testified that from 1917 until the creation of the present public utilities commission in 1932, he represented the municipal railway in all labor negotiations. Mr. Bullock represented the board of supervisors and Mr. Hammond the board of public works. That was before and after 1925. During that period of time he was never confronted with any demands to the effect that the workmen on this railway were guaranteed an eight-hour day. The first time that he realized that a demand was being made by any employee of the railway to the effect that the charter guaranteed him an eight-hour day was in the spring of 1949 at a meeting in Mr. Turner's office, attended also by three or four union representatives. Edward G. Cahill was manager of utilities from April 1, 1932, until October, 1945. In that capacity he certified payrolls upon the municipal railway. In performing that function he was mindful of the requirement of section 150 of the new charter that 'No officer or employee shall be paid for a greater time than that covered by his actual service,' and abided by it. He testified that the 1932 bulletin which we have quoted did not come to his attention until sometime after its issuance. In late 1934 he was approached by union representatives concerning it. He investigated the situation, took it up with the public utilities commission and recommended that it be changed. This resulted in the above quoted bulletin of 1935. During those discussions with the union representatives, Cahill said, no claim was made by them that the men were entitled to an eight-hour day by virtue of the charter provision. Henry S. Foley, an employee of the municipal railway for approximately 33 years preceding 1951, was one of those representatives. He testified that in 1946

the city and county controller notified the railway management they would have to discontinue paying for 'dead time'; at that time operators whose runs finished at 7:45, and so on, up to eight hours were paid a full eight hours' pay. Subsequently, Foley requested reinstatement of the practice of allowing eight hours' pay for such runs.

"William H. McRobbie, engaged in various employments on the municipal railway over the years, a member of the same union as Mr. Foley, testified that he was active in the union in 1932, and following, to restore the range time, overtime pay for work done after the ten-hour span. Finally, his committee met with Mr. Cahill, the mayor, and the city attorney. There was a discussion as to whether it was legal to pay this penalty time for any work performed in excess of ten hours' spread. The city attorney orally stated that in his opinion it was legal. That meeting was about two weeks before the issuance of the 1935 bulletin restoring range time. Asked if at that meeting there was any assertion that the men, by virtue of the charter, were afforded a guarantee of eight hours a day, he said 'No, there was no assertion that the men, all the men would be guaranteed eight hours a day; however, we did contend that the regular runs should be eight hours and any work performed in excess of the ten hours spread should be paid for at the rate of time and a half; that was all that was discussed.' Concerning the regular runs, he explained that the city and county had been giving eight hours' pay for those runs which were in fact but seven hours and 45 minutes; that after the range time was taken away, the contention was being made by those who took it away that the pay for such runs should be only for actual time, seven hours and 45 minutes. He said that he and his committee did refer to the charter 'in this respect: That the implication was contained in that Charter amendment that would pay time and a half for all work in excess of the ten-hour spread; that was the main contention at that time'; that there was also talk 'for the restoration of that pay between seven hours and forty-five minutes and eight hours.'

"Respondents attach some significance to two items which they suggest show an administrative interpretation in favor of an eight-hour guaranteed workday. The first of these appears in a letter dated March 19, 1925, from Mr. Boeken, then superintendent of the municipal railway, to Honorable Ralph McLaren, then Acting Mayor of San Francisco, concerning the problem of complying with the provisions of

Charter Amendment No. 21, the 1925 amendment. Concerning estimated costs for an average month, there was included this item: 'Cost for time allowed for runs under eight hours, $2,898.23. This item does not enter into Amendment 21.' Appellants explain this statement by reference to management's established practice prior to 1946 of paying a full eight hours' pay for a regular run of seven hours and 45 minutes. This seems the only reasonable inference that can be drawn considering the relatively low monthly cost noted, and in view of the interpretations made of the 1925 amendment by the city attorney in April and by Mr. Halling, president of Local 518, in March, 1925. The second item consists of an unsigned memorandum dated September 4, 1925, entitled 'Municipal Railway, San Francisco, data re working conditions of platform men.' This memorandum was prepared in response to a written request from another transit company and consists of a short summary of working conditions before and after the effective date of Charter Amendment No. 21. In it this statement appears: 'Previous to Charter amendment, schedules were made out on an eight hour day with no limits as to range, except that they were kept as near ten hours as possible. All *regular* runs under eight hours were paid full eight hours and time and one-half was paid for all time beyond eight hours and twenty minutes. Number of hours after Charter amendment 21? Conditions same as above, except that overtime is paid after eight hours instead of after eight hours and twenty minutes, and one [and one-] half time is also allowed after the tenth hour range. . . . (Emphasis added.) The statement concerning eight hours' pay for all regular runs should be read in the light of the practice then in force of treating a regular run of seven hours and 45 minutes as the equivalent of a full eight hour regular run. We conclude that these two items, viewed in their setting, are in harmony, not in conflict, with our analysis of the administrative interpretation.

"This is all of the significant evidence of administrative interpretation which has been brought to our attention by the parties or discovered by us in the record. It does not support the finding that the 'administrative construction adhered to throughout the years of Section 125 of the Charter is not in contravention of petitioner's [respondents', upon this appeal] construction.'

"(2) *In respect to the fixing of 'the wages of platform*

*employees and bus operators of the municipal railway,' section 151.3*[8] *of the charter* directs the civil service commission, each year, to certify to the board of supervisors 'the two highest wage schedules in effect on July 1st of that year for' such employees 'of other street railway systems in the State. . . .'

"The board thereupon fixes wage schedules for such employees 'which shall be the average of the two highest wage schedules so certified' by the commission. If such average is less than the rate fixed therefor in San Francisco's salary standardization ordinance adopted March 18, 1946, the board shall fix the wage schedules at the same rates as those fixed in that ordinance.

"Respondents claim that section 151.3 requires the commission to include guaranteed hourly, weekly, or monthly wage rates, if any, in effect in such other railway systems. The appellants claim that 151.3 does not require the inclusion of any such guaranty factors.

"The court found that in 1949 the commission certified that the wage schedules of Torrance Municipal Bus Lines, Torrance, and the California Street Cable Line, San Francisco, were the two highest. The court further found that the Torrance schedules provide monthly guaranteed wages ranging from $231 to $265 according to the number of years of service of the employee; also, that the California Street Cable schedule provided for a guaranteed work week of six days or 48 hours per week;[9] but that the commission refused to certify those elements of the two highest wage schedules, certifying only the hourly rate for each. In this connection we observe that the court also found that the commission when certifying the Torrance hourly rate, included the several monthly wage rates ('1st year of service $221 per month equal to $1.275 per hour . . . 5th year of service $265 per month equal to $1.52884 per hour' and recited 'Factor used to convert to per hour rate is—$4\frac{1}{3}$ weeks of 40 hours each per month or 1.73.33 hours per month.'

"The court found that because of the omission of the 'minimum guaranteed work week features' of these two systems from the certification, the commission had deprived the respondents and others similarly situated of a 'daily and

---

"[8] (Stats. 1947, ch. 2 of Res., p. 3264, at p. 3266.)

"[9] Appellants do not question the accuracy of this finding as to these features of the Torrance and California Street schedules, except that they claim that the California Street 'extra platform men were in direct terms excluded from the eight hour provision.'

weekly wage equivalent to the average of the wages receivable by platform employees and bus operators' of the two systems mentioned.

"The conclusions of law followed these findings. The judgment gave declaratory relief and ordered the issuance of a writ of mandate requiring the commission to certify to the board of supervisors 'in addition to the hourly rate of wages of the two highest wage schedules in California, any guarantee of minimum daily, weekly, or monthly wage contained in said schedules, affecting the wage rate or wages.'

"Although this conclusion may have been based in part upon the premise that section 125 guarantees wages for at least eight hours each scheduled workday upon which an employee performs every assignment given him, the conclusion does not necessarily fall with that premise. If section 151.3 should, in a given year, guarantee a minimum wage because the two highest wage schedules of other systems embrace such a provision that year, it would operate and apply to the respondents and others similarly situated quite independently of section 125. Especially so, in view of the positive declaration in section 151.3 that the wages of platform employees and bus operators shall be determined and fixed as provided in section 151.3 'Notwithstanding· the provisions of section 151 or any other provisions of this charter.'

"Let us analyze the significant portions of section 151.3.

"It was added to the charter as a new section by an amendment which took effect January 15, 1946. (Ch. 8 of Res., 1st Ex.Sess. 1946; printed in Stats. 1947, p. 219, at 233. At that time it provided for the establishment of rates of pay for 'groups and crafts' predicated upon rates fixed in collective bargaining agreements, under the conditions described in section 151.3.

"The section was later enlarged by an amendment which took effect January 7, 1947. (Stats. 1947, ch. 2 of Res., p. 3264, at 3266.) The amendment slightly modified the original text and added the provisions which now govern the fixing of wage schedules for platform men and bus operators. In this form section 151.3 consists of two distinct parts, although not separately designated as such by paragraph or subdivision numbers. For convenience of reference we designate them as Part I (the original text as modified in 1947) and Párt II (the substantive addition made in 1947).

"It is important to consider both parts, for Part I has been judicially interpreted. That interpretation may be

helpful in ascertaining the meaning of Part II. The significant portions of the section read as follows:

" 'Section 151.3 [Part I] Notwithstanding any of the provisions of section 151 or any other provisions of this charter, whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco, and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as the compensation for such groups and crafts engaged in the city and county service. The rate of pay so fixed by the board of supervisors shall be determined on the basis of rates of pay certified by the civil service commission on or prior to April 1st of each year and shall be effective July 1st following; provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which the said revisions are determined. . . .

" ' [Part II] Notwithstanding the provisions of section 151 or any other provisions of this charter the wages of platform employees and bus operators of the municipal railway shall be determined and fixed, annually, as follows:

" ' (A) On or before the second Monday of July of each year the civil service commission shall certify to the board of supervisors the two highest wage schedules in effect on July 1st of that year for platform employees and bus operators of other street railway systems in the State of California;

" ' (B) The board of supervisors shall thereupon fix wage schedules for platform employees and bus operators of the municipal railway which shall be the average of the two highest wage schedules so certified by the civil service commission; provided, if the average of the two highest wage schedules shall be less than the rates of pay fixed for such service in

the salary standardization ordinance adopted by the board of supervisors on March 18, 1946, the board of supervisors shall fix wage schedules for such service which shall be the same as the rates fixed for such service in the said ordinance;

" '(C) When, in addition to their usual duties, such employees are assigned duties of instructors of platform employees or bus operators they shall receive twenty (20¢) cents per hour above the rates of pay fixed for platform employees and bus operators as herein provided;

" '(D) The rates of pay so fixed for platform employees and bus operators as herein provided shall be effective from July 1st of the fiscal year in which such rates of pay are certified by the civil service commission;

" '(E) Platform employees and bus operators shall be paid one and one-half times the rate of pay fixed as herein provided for all work performed on six days specified as holidays by ordinance of the board of supervisors for such employees . . . '

"Part I was interpreted by this court in *Adams* v. *Wolff,* 84 Cal.App.2d 435 [190 P.2d 665]. (A petition for a hearing by the Supreme Court was denied by that court.) The case involved the rates of pay of municipally employed machinists and mechanics.

"The pertinent collective bargaining agreements prescribed pay at a fixed sum for day work on the basis of a work week consisting of five days, except that when certain holidays fell on work days the same rate of pay per week was fixed, pay for a four-day week with such holidays off without loss of pay. Also, those agreements increased the rate of pay 10 per cent and 15 per cent respectively, for work on night and midnight shifts. They also provided that a foreman would receive 10 per cent in excess of the journeyman rate. (The city conceded the foreman pay differential if Part I were found constitutional.)

"The judgment of the trial court allowed the holiday pay, the increased rates for night and midnight shifts, and the increased rate for foremen. We affirmed the judgment.

"We did so after analyzing the section [Part I] and finding that by it 'the people have set up a standard for determining rates of pay that will insure these public employees a wage scale commensurate with wages received by workers in the same field in private industry.' (P. 443.)

"Concerning holiday pay and premium pay on the night and midnight shifts, we said: 'Section 151.3 requires the

"rate of pay" to be fixed in the manner there set forth. It is contended that this relates only to the "basic" rate of pay, and that holiday and premium pay on night shifts does not relate to the "basic" rate of pay but relates to "working conditions," and it is urged that the fixing of working conditions is beyond the scope of section 151.3. It is probably true that section 151.3 relates only to the "basic" rate of pay and does not relate to "working conditions." But that in no way assists defendants. It is quite apparent that it was the intent of section 151.3 to give to the public employees of the type here involved the same take home pay received by private employees in the same industry. That means that when the public employees work on a night shift, or where a work week is interrupted by a holiday they are to receive the same pay that private employees would receive for work similarly performed. It is quite obvious that night shift pay and pay for holidays is a part of the "basic" rate of pay, and is as much a part of the wage structure as the hourly wage itself. If evidence were necessary on such an obvious matter it was supplied by Norman Beals, San Francisco representative for the State Personnel Board, who so testified. The "basic" "rate of pay" is the take home pay of the employee. The charter provision guarantees that the take home pay of public employees shall be the same as private employees. That obviously includes holidays and premium pay for night work.' (Pp. 444-445.)

"Later, we had for consideration the question whether or not Part I of section 151.3 envisioned and embraced provisions for vacation with pay (five days each year, after one year of service; ten days, after three years of service) if contained in the pertinent collective bargaining agreements. We concluded that it did, by the same process of reasoning as that used in *Adams* v. *Wolff, supra*. (*Adams* v. *City & County of San Francisco,* 94 Cal.App.2d 586 [211 P.2d 368, 212 P.2d 272]. A petition for hearing by the Supreme Court was denied by that court.) We said: 'the "rate of pay" is the "take home pay" of those on the list of employees in good standing eligible for active duty. . . . Pay for an unworked holiday is part of the basic rate of pay. (*Adams* v. *Wolff, supra.*) The number of holidays is designated in the private collective bargaining agreement. With equal right and authority may the same agreement control the number of vacation days. The *period of vacation,* if any, set forth in a private bargaining agreement is the period that the public employees

must accept, for the reason that it is part of the basis upon which "rate of pay" is computed.' (P. 592.)

"We further observed: 'The holding in *Adams* v. *Wolff, supra*, that section 151.3 [Part I] was intended to equalize take home pay and that holiday pay is a part of the basic rate of pay must be considered controlling, and forces a determination that vacation pay directly and with certainty affects the hourly, the weekly, the monthly or the yearly wage.' (P. 594.)

"The five and ten day vacation periods which Part I of section 151.3 thus prescribed, prevailed over the two weeks' period prescribed by section 151 of the charter because of the declaration at the very beginning of Part I that its provisions operate and apply 'notwithstanding the provisions of section 151.' Later, the addition of sections 151.4[10] and 151.5[11] modified the scope of section 151.3 (both Part I and Part II) in relation to vacation privileges. That modification leaves intact the scope and application of Parts I and II of section 151.3 in relation to other 'take home pay' features appearing in collective bargaining agreements or in the 'two highest wage schedules.'

"Section 151.5 in declaring that vacation rights 'contained . . . in any street railway or bus wages schedules,' as well as those 'contained in any collective bargaining agreements,' shall 'in no way increase, reduce, or otherwise affect or be deemed to affect' the 'wage of pay rate or schedule determinations made pursuant to the provisions of said section 151.3,' recognizes the possibility that Part II as well as Part I comprehends and embraces guaranteed or minimum wages. We do not view these provisions as a legislative interpretation or determination that section 151.5 does comprehend and embrace such features. It is probable that these references to Part II of section 151.3 were of a precautionary nature, to preclude the possibility of such an interpretation in relation to 'vacation rights,' especially in view of the use of the words 'or be deemed to affect.' Significantly, however, section 151.5 removes from the purview of section 151.3 [Part II as well as Part I] only the vacation with pay element of the take home pay feature, no other element thereof, such as premium pay for night shifts or guaranteed daily, weekly, or monthly wages.

---

"[10] § 151.4 added: 1949 first Ex. Sess., ch. 4; Stats. 1950, p. 36 at 46.

"[11] § 151.5 added: 1950 third Ex. Sess., ch. 10; Stats. 1951, p. 100, at 102.

"What of the similarity, if any, of the provisions of Part II of section 151.3 to Part I of that section, and the applicability to Part II of our interpretation of Part I?

"They are similar in this: Each reaches out for a yardstick; Part I to collective bargaining agreements in private industry, Part II to other street railway systems, public or private. Part I uses the term 'rates of pay'; Part II, 'wage schedules.' Part I uses the rate ('such rate'), established by collective bargaining agreements, which is 'generally prevailing' in San Francisco. Part II uses 'the average of the two highest wage schedules' of other street railway systems than the San Francisco municipal railway system.

"The only seeming differences[12] are: (a) 'The average' in Part II, instead of 'such rate' in Part I; and (b) 'wage schedules' in Part II, in contrast to 'rates of pay' in Part I. Neither of these is a differentiating factor. 'The average rate' denotes a fixed and certain quantity or quality, equally as does 'such rate.' 'Wages schedules' is equally as comprehensive in its scope and sweep as is the expression 'rates of pay'; perhaps more comprehensive, certainly not less comprehensive.

"The conclusion seems irresistible that Part II sets up a standard for determining wage schedules (rates of pay) that will assure the municipal platform men and bus operators of San Francisco a wage scale commensurate with the highest wages received by workers in the same field in this state (the same take home pay), using the average of the two highest as a yardstick.

"We conclude that Part II comprehends 'guaranteed or minimum daily, weekly, or monthly wages' (as found by the trial court), within the scope of the yardstick prescribed by Part II of section 151.3 as factors to be ascertained and certified by the civil service commission to the board of supervisors for the information and use of the board in fixing the indicated wage schedules.

"Appellants ask how minimum wages can be averaged when one is a monthly wage and the other is weekly, or when one street railway system has a minimum wage and the other not. The answer is that this question is not here involved. It is the function of the board of supervisors (not the civil service

---

"[12]We are mindful of the fact that paragraph (E) of Part II fixes pay at time and one-half for work done on certain holidays and paragraph (C) prescribes 20 cents per hour extra for instruction service, features not in Part I. These features, however, are limited in scope and obviously do not change the overall resemblance of Part II to Part I.

commission) to do the averaging, when it fixes the wage schedules, and the board is not a party to this action.

"Appellants make the further claim that, prior to suit, the petitioners made no demand upon the civil service commission to include the minimum wage factor when certifying the two highest wage schedules to the court. This, of course, has reference to the writ of mandate, not the declaratory relief count on that subject.

"The answer is that the record demonstrates that such a demand would have been futile. (*Moreing* v. *Shields,* 28 Cal. App. 513 [152 P. 964] ; *Moore* v. *Superior Court,* 20 Cal.App. 299 [128 P. 946].)

"Appellants further contend the judgment is erroneous in directing a peremptory writ of mandate on this subject because the alternative writ of mandate did not include such a provision. The answer to this point is that the respondents in their amended petition asked for a writ of mandate for certification of the minimum wage features of the Torrance and California Street Lines, and for general relief; the appellants joined issue; the case was thoroughly tried; and the appellants have not indicated that they presented this point to the trial court.[13] The trial court, of course, did not in its judgment command the commission to certify the minimum wage features of the Torrance and California Street Cable Lines. Certification occurs each year. No one could predict what two street railway systems might in future years have the highest wage schedules. The court did appropriately direct the commission to include minimum wage features appearing in any wage schedule certified by it to the board of supervisors in any year in the future. In this situation, the principles enunciated in *Buxbom* v. *Smith,* 23 Cal.2d 535, at 542-543 [145 P.2d 305], apply.

"(3) *We do not find the judgment uncertain or contradictory in its provisions.* Should ambiguities develop, we believe they could be resolved by reference to the findings of fact and conclusions of law.

"(4) *The practice and procedural points presented by the appellants* include the following claims asserted by them: (a) the respondents are not in a position, have not the legal right to raise the questions presented by them, (b) there is no true basis for a class suit, and (c) the judgment is incapable

---

[13] The alternative writ was issued in July, 1949. The second amended petition was filed in March, 1951. The return to the second amended petition was filed May 8, 1951. The case was tried on the issues thus joined, the trial commencing June 7, 1951.

of complete enforcement for lack of proper parties and for failure to include the controller and the civil service commission in the writ of mandate to Turner.

"(a) *The claim that the respondents are without legal right to raise the questions presented by them* seems predicated upon the asserted fact that the seniority of each of the respondent(s) is such that he, in fact, has an eight-hour day. This we think is not a significant factor. It appears to be true that a high seniority may presently assure a platform man or bus operator of a run of such a length that he will be able to put in eight hours each day, perhaps eight hours within a span of ten; and thus also be assured of his minimum wage. However, it is possible, under appellants' interpretation of the charter that management in response to rider demand might find it necessary to readjust the service in such a manner as to reduce a good many regular runs to considerably less than eight hours, and divide others into parts, spreading them over a span considerably in excess of ten hours. In other words, it appears that each senior employee has this sword of Damocles suspended over him by a potentially slender thread. He believes that the charter makes certain guaranties. He should be able to have such questions determined before the sword falls. (The second amended petition in this action was filed March 14, 1951, and the judgment is not yet final.) The law accords him that right. He, therefore, is properly in court, asserting his claim.

"(b) *Appellants contend there is no true basis for a class suit.* They question the propriety of extending the benefits of this judgment to include other 'employees similarly situated.'

"They present two bases for this claim. The first is that there are two unions to which the employees in the operating department of the municipal system respectively belong, no employee having membership in both unions. It is asserted that the respondents belong to but one of these unions and therefore cannot very well represent those employees who give adherence to the other union. This, we think, is a false quantity. The respondents appear in this action as employees of the city and county, not as members of a union. Neither of the unions, as such, is a party to the action.

"The other premise is that each of the respondents 'is that each of the respondents afforded the identical work schedule sought for in this second amended petition, if they had not of their own volition, absented themselves from work.'

(Appellants' Opening Brief, pp. 61, 62.) From this premise (assuming solely for the purpose of discussion the accuracy of this quoted statement), appellants conclude that the respondents do not belong to the same class or group as those operators, whether regular or extra men, who do not presently enjoy such a schedule. That conclusion does not follow. For, as we have seen (in subparagraph (a), above), respondents' enjoyment of the sought for schedule (under appellants' interpretation of the charter) is not a matter of right; i.e., a mere privilege, enjoyed today and gone tomorrow. This certainly puts these respondents in the same class as all other operators, whether regular or extra men.

"(c) *Appellants claim that the judgment is incapable of complete enforcement* because of the absence as parties of the public utilities commission and the city and county itself, and the mandate to Turner does not run also to the controller and the civil service commission.

"In this connection they direct attention to the fact that Manager Turner, who by this judgment is directed to certify time rolls or payrolls in a certain manner, works under the direction of the public utilities commission and the commission, not a party to the action, would not be bound by the judgment. They direct attention also to the fact that although the members and secretary of the civil service commission are parties, the judgment does not operate directly upon them by way of ordering them, when scrutinizing payrolls, to recognize the certification of eight hours per day per man by Turner. They make the same observation in respect to Controller Ross who, though a party to the action, is not by the judgment expressly directed to do anything.

"We may assume for the purpose of this discussion that the controller and the civil service commission and its secretary, although parties to the action, might not be bound by Manager Turner's certification of payrolls. That would not necessarily render the judgment incomplete or abortive. Should the judgment in the form rendered become final, it would be binding upon Manager Turner and would govern him in the certification of payrolls. The mere fact that it might not be binding upon and govern these other officials, including the members of the public utilities commission, would furnish no sufficient reason in itself for reversal of the judgment. There is no basis for assuming that these other officials would disregard the law as thus adjudicated. Should

they disregard it as thus finally adjudicated, the remedy would be the institution of another legal proceeding of an appropriate nature.

"The judgment is reversed insofar as it declares that respondents (the petitioners below, and employees similarly situated) are entitled to wages for at least eight hours each scheduled workday (as stated in subparagraph (a) of paragraph 3 of the judgment) and insofar as it orders and decrees that a writ of mandate issue ordering appellant James Turner to approve and transmit to the civil service commission time rolls or payrolls showing that each respondent and employee similarly situated is credited for at least eight hours of work within a span of ten, each scheduled workday (as stated in paragraph 1 of the judgment). In all other respects the judgment is affirmed. Each party will bear his own costs upon this appeal."

TRAYNOR, J., Dissenting.—I agree with the discussion in the majority opinion concerning section 125 of the charter. It is my opinion, however, that for the reasons set forth in the opinion written by Mr. Justice Fred B. Wood for the District Court of Appeal, 1st Dist., Div. 1, when this case was before that court (Cal.App.) 256 P.2d 662, section 151.3 of the charter requires consideration of any minimum wage guarantees included in the wage schedules of the other street railway systems.

Gibson, C. J., concurred.