[Crim. No. 19381. Sept. 19, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
EVELYN McGEE et al., Defendants and Appellants.

COUNSEL

Paul Bell, under appointment by the Supreme Court, Appellate Defenders, Inc., under appointment by the Court of Appeal, and Theodore E. Davis for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler, Patricia D. Benke, and Beatrice W. Kemp, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TOBRINER, J.**—Section 11483 of the Welfare and Institutions Code, which prescribes criminal penalties for those who fraudulently obtain welfare benefits under the Aid to Families with Dependent Children (AFDC) program, incorporates by reference a statutory requirement that "restitution shall be sought . . . prior to the bringing of a criminal action."[1] Earlier this year, in *In re Sands* (1977) 18 Cal.3d 851 [135 Cal.Rptr. 777, 558 P.2d 863], we held that a criminal defendant may not collaterally attack a final AFDC fraud conviction on the ground that the state had failed to seek restitution prior to instituting the criminal proceedings, concluding that such a failure did not constitute a "fundamental jurisdictional defect" cognizable on habeas corpus. In reaching that conclusion, we left open the question whether the failure to seek restitution prior to the institution of a welfare fraud prosecution would provide a basis for reversal of a conviction when such failure was raised on direct appeal, rather than on habeas corpus. In the instant case, we face the issue *Sands* did not resolve.

As we explain, resolution of this issue turns on the question of whether the provisions of section 11483 should be accorded "mandatory" or "directory" effect. As we point out, much semantic confusion has

---

[1]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

persisted in the past with respect to the mandatory-directory terminology. ■ The decisions, however, establish that statutory procedures designed to protect individuals who are the subjects of adverse governmental action should generally be accorded mandatory effect, so that a failure to comply with applicable procedures invalidates any sanctions taken against them. ■ The crucial issue in the instant case thus becomes whether the statutory requirement of a prior attempt at restitution in welfare fraud cases was designed to provide protection to a person accused of welfare fraud or was enacted solely as a mechanism for protecting the fiscal resources of the state.

For the reasons discussed below, we have determined that the statutory provision at issue sought to provide some, albeit limited, protection to those accused of welfare fraud; to achieve such protection, we conclude that the section must be accorded mandatory effect. As we explain, however, in the instant case the evidence presented at trial demonstrates that the state did, in fact, seek restitution from defendants with respect to one of the two separate fraudulent misstatements charged in the information. We therefore reverse the judgment only insofar as it rests on the fraudulent conduct as to which the state failed to show a timely attempt at restitution.

### 1. The facts

The uncomplicated facts of this case are not in dispute on this appeal. In the spring of 1972, defendants Evelyn and Earnest McGee were receiving AFDC benefits through the Imperial County Welfare Department. On April 17, 1972, Earnest began working for the Holly Sugar Company, but two days later, on April 19, 1972, Earnest and Evelyn falsely stated in a verified AFDC benefit renewal application that neither of them was employed, that they were receiving no income other than unemployment insurance and public aid and that neither had had a job offer within the last 30 days. The welfare department discovered the falsity of this statement on June 23, 1972, when Evelyn disclosed in an interview with a welfare department employee that Earnest had been working at Holly since about May; a review of Holly's employment records revealed that Earnest had actually begun working on April 17.

On July 5, 1972, the welfare department sent a letter to the McGees requesting their personal appearance at the department offices. On August 29, 1972, Earnest came to the department and signed a note in which he agreed to repay $338, the amount which the department

determined had been improperly paid to the McGees as a result of the misrepresentation; by the terms of the note, payments were to be made in $5 monthly installments. According to the department's records, Earnest had only made two $5 payments on the note as of the date of trial in March 1975.

Earnest's employment with Holly terminated on August 2, 1972, and the McGees again sought and obtained AFDC benefits through the Imperial County Welfare Department beginning in the latter part of 1972. On January 5, 1973, Evelyn began working at the Airporter Hotel, but when the McGees completed their periodic AFDC renewal application on February 14, 1973, they failed to disclose this employment and falsely stated that they had received no income from any such source. The department discovered the McGees' misrepresentation on March 21, 1973 and discontinued welfare benefits as of that date; the department's computations reveal that the McGees received an overpayment of $734 as a result of this second false statement.

In December 1974, a three-count felony information was filed in the Imperial County Superior Court against the McGees. The first count pertained to the false statement of April 19, 1972, and alleged that Earnest, in violation of section 11483, had wilfully made the false statement to obtain aid and, by virtue of the statement, had obtained in excess of $200 in unjustified benefits. The second count related to the February 14, 1973, misrepresentation, and charged that Evelyn, in violation of section 11483, had similarly made the false statement to obtain aid and had obtained more than $200 in unwarranted benefits. The third count charged both Evelyn and Earnest with having conspired, in violation of Penal Code section 182, to commit the acts of welfare fraud charged in the first two counts. The information contained no allegation that the county welfare department or the district attorney had in any way attempted to seek restitution prior to the institution of the criminal charges.

After arraignment, defendants filed a general demurrer to the information, contending that in charging a violation of section 11483, the People must plead and prove that restitution had been sought prior to the filing of the criminal charges; since the information contained no such allegation, defendants charged a fatal flaw in the complaint which compelled dismissal. In response, the People argued that the restitution provision is merely permissive and that the failure to comply with it does

not afford a defense in a criminal action. The trial court overruled defendants' demurrer and the case went to trial.

On the basis of evidence demonstrating the above facts, the jury returned a verdict finding defendants guilty of all of the charged offenses. The trial court suspended imposition of sentence and granted both defendants three years probation on condition that they each serve numerous weekends in jail and make restitution of $604.93 at the rate of not less than $20 per month.[2] Defendants appeal from the order granting probation. (Pen. Code, § 1237.)

2. ■■■ *Under section 11483, the state is required to seek restitution prior to bringing a criminal action and is not granted discretion to decline to follow the statutory directive.*

Defendants contend that under section 11483 their convictions must be reversed because the People failed to plead and prove that restitution was sought prior to the institution of these criminal proceedings. The People maintain, in response, that the statutory provision relating to restitution was intended only as a statement of a general legislative preference that restitution be sought prior to criminal prosecution and was not intended to impose a "mandatory" requirement. Our analysis of the issue begins, of course, with a review of the relevant statutory provisions.

Section 11483 presently provides in full: "Whenever any person has, by means of false statement or representation or by impersonation or other fraudulent device, obtained aid for a child not in fact entitled thereto, the person obtaining such aid shall be punished as follows: [¶] (1) If the amount obtained or retained is two hundred dollars ($200) or less, by imprisonment in the county jail for a period of not more than six months, a fine of not more than five hundred dollars ($500), or both such imprisonment and fine. [¶] (2) If the amount obtained or retained is more than two hundred dollars ($200), by imprisonment in the state prison for not less than one year or more than 10 years or by imprisonment in the county jail for not more than one year. [¶] *All actions necessary to secure restitution shall be brought against persons in violation of this section as provided in Sections 12250 and 12850.*" (Italics added.)

---

[2]Under the terms of the judgment, Earnest's probation is conditioned upon his serving 10 weekends in county jail and Evelyn's probation is conditioned upon her serving 5 weekends in county jail.

In 1970, at the date of the enactment of the emphasized portion of section 11483, section 12250 (fraud in obtaining aid to the needy aged) and section 12850 (fraud in obtaining aid to the needy blind) contained an identical concluding paragraph, which provided: *"It is the intent of the Legislature that restitution shall be sought by request, civil action, or other suitable means prior to the bringing of a criminal action."* (Italics added.) ██ It is the interpretation of this latter provision, as incorporated into section 11483, which lies at the heart of the present controversy.[3]

In determining the proper effect to be given this statutory language, we undertake at the outset to clarify some confusion in terminology that has frequently inhibited analysis of similar questions of statutory interpretation in the past. Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded "mandatory" or "directory" effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. As we explain below, in evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design.

Although the parties to this action have utilized the mandatory-directory terminology in their briefs, both parties, sharing the confusion exhibited in some past judicial decisions, have improperly equated the mandatory-directory duality with the linguistically similar, but analytically distinct, "mandatory-permissive" dichotomy. ██ As we explained recently in *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606], in the latter context "the term 'mandatory' refers to an obligatory [procedure] which a governmental entity is required to [follow] as opposed to a permissive [procedure]

---

[3]Sections 12250 and 12850 were repealed in 1973, but the substance of the restitution requirement embodied in those provisions was reenacted in new section 13200. Notwithstanding their repeal, sections 12250 and 12850 remain operative to the extent that they are incorporated into section 11483. " 'It is a well established principle of statutory law that where a statute adopts by specific reference the provisions of another statute . . ., such provisions are incorporated in the form in which they exist at the time of the reference . . . and that the repeal of the provisions referred to does not affect the adopting statute in the absence of a clearly expressed intention to the contrary.' " (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58-59 [195 P.2d 1].)

which a governmental entity may [follow] or not as it chooses. By contrast, the 'directory' or 'mandatory' designation does not refer to whether a particular statutory requirement is 'permissive' or 'obligatory,' but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates. [Citations.]" (See also *Ryan v. Byram* (1935) 4 Cal.2d 596, 603-604 [51 P.2d 872].)

Although the mandatory-directory and obligatory-permissive dichotomies are thus analytically distinct, in some instances there is an obvious relationship between the two. If, for example, a statute simply embodies a permissive procedure with which a governmental entity may or may not comply as it chooses, the entity's failure to comply will generally not invalidate the entity's subsequent action. The converse of this proposition is not always true, however, for as we observed in *Morris,* "[m]any statutory provisions which are 'mandatory' in the obligatory sense are accorded only 'directory' effect." (18 Cal.3d at p. 908, fn. 4.)

In the instant case, the People claim initially that the restitution provisions are permissive rather than obligatory and consequently that defendants cannot complain of any failure to comply with the statutory procedure. If the statutory provision were simply permissive in nature, leaving the state full discretion to determine whether or not to seek restitution prior to criminal prosecution, reversal would clearly be unwarranted. As we explain, however, both the statutory language and the contemporary administrative interpretation of the provision demonstrate that the statutory requirement was intended by the Legislature as obligatory rather than as simply advisory.

The Legislature first enacted the pertinent statutory language in 1957 as an amendment to sections 2007 and 3006, the predecessor statutes of sections 12250 and 12850. (Stats. 1957, ch. 570, §§ 1, 3, p. 1660.) Prior to the amendment, section 2007 did not refer to efforts to seek restitution, and section 3006 provided simply that a person who fraudulently obtained welfare benefits "shall make restitution and all actions necessary to secure restitution *may* be brought against him." (Italics added.) The 1957 legislation added the present provision to both sections: "It is the intent of the Legislature that restitution *shall* be sought by request, civil action, or other suitable means prior to the bringing of a criminal action." (Italics added.) Section 15 of the code, one of the general provisions applicable to all sections of the code, stipulates that " '[s]hall'

is mandatory and 'may' is permissive." Thus, on its face, the statutory language suggests that the Legislature intended the present provision to be mandatory (i.e., obligatory), rather than permissive.

Although the People contend that the use of the introductory phrase "[i]t is the intent of the Legislature" suggests that the Legislature intended the provision to be simply a nonbinding statement of preference, the legislative history of the provision negates any such interpretation. As initially introduced in both the Senate and the Assembly (Sen. Bill No. 1389, Assem. Bill No. 1740), the 1957 legislation would have amended the existing sections to provide: "It is the intent of the Legislature that a civil action shall first be brought and criminal action resorted to only after civil action proves unsuccessful."

As the Court of Appeal recognized in *Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348], this initial version of the legislation would have rendered restitution *a complete defense* to a criminal prosecution and, as such, was obviously intended to be obligatory in nature, notwithstanding the use of the introductory phrase of "[i]t is the intent of the Legislature." Although the bill was subsequently amended to delete the language which would have rendered restitution a complete defense to criminal charges, the legislation as enacted retained the requirement that restitution "shall" be sought prior to the bringing of a criminal action, as well as the original phrasing of the introductory clause. Under these circumstances, the "[i]t is the intent of the Legislature" terminology clearly does not evidence any legislative intent to render the statutory requirements merely advisory or permissive.

Moreover, and perhaps most significantly, the People's contention that the statutory requirement should be interpreted as permissive rather than obligatory flies in the face of the uniform administrative interpretation of the statutory provision reflected in administrative regulations promulgated by the Department of Social Welfare. The pertinent regulations in force in 1970 when the Legislature incorporated the restitution requirement of sections 12250 and 12850 into section 11483 provided that "[w]hen reasonable grounds exist to suspect that fraud has occurred, the case shall be referred to the district attorney for further action. . . . In [the categories of aid covered by sections 12250 and 12850], attempts to obtain restitution by request, civil action, or other suitable means *shall* be used prior to referral, after which the case shall be referred to the district

attorney." (Italics added.) (Dept. of Soc. Welf. Manual, former §§ 20-007.1, 20-007.11.)

The above regulations clearly indicate that the administrative agency interpreted the statutory requirement as an obligatory directive, requiring the state to seek restitution in all cases, rather than as merely an advisory recommendation. ▉ Under our cases, of course, such a "contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not controlling, is given great respect." (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 643 [12 P.2d 526].)[4]

▉ Accordingly, we conclude that the statutory provision in question is obligatory rather than permissive. Under section 11483, the state is required to seek restitution prior to bringing a criminal action and enjoys no discretion to refrain from complying with the dictates of the statute.

3. ▉ *Because the statutory requirement of a prior attempt at restitution was intended to provide protection for individuals accused of welfare fraud, the statute must be accorded mandatory effect, and the state's failure to follow the prescribed procedure constitutes a basis for challenging a subsequent criminal prosecution.*

Our conclusion that the restitution provision of section 11483 is obligatory rather than permissive does not, however, end the relevant inquiry in this case. ▉ As noted at the outset, some statutory procedures which are obligatory in nature, i.e., which a governmental entity is required to follow, are still accorded only directory effect, in that the failure to comply with such procedures does not invalidate subsequent actions. (See, e.g., *Morris* v. *County of Marin, supra,* 18 Cal.3d 901, 908-909, fn. 4.) The question before us, of course, is whether the state's failure to seek restitution prior to instituting criminal proceedings should have the effect of invalidating a subsequent criminal conviction, i.e., should be accorded mandatory, rather than directory, effect.

"As Chief Justice Gibson explained in *Pulcifer* v. *County of Alameda* [(1946)] 29 Cal.2d 258, 262 [175 P.2d 1], there is no simple, mechanical

[4]The regulations also refute the People's contention, raised for the first time at oral argument, that the statute should be construed as if it read "restitution shall be sought [*if at all*] . . . prior to the bringing of a criminal action." The regulations demonstrate that the administrative agency, following the statute's clear language, interpreted the legislation to require the state to seek restitution in all cases before proceeding with a criminal prosecution.

test for determining whether a provision should be given 'directory' or 'mandatory' effect. 'In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] *When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose* [citation]. . . .' " (Italics added.) (*Morris v. County of Marin, supra,* 18 Cal.3d 901, 909-910.)[5]

In emphasizing that the designation of a statute as either mandatory or directory must be made with reference to the statute's purpose, *Pulcifer* reiterated the teachings of earlier decisions of both this court and the United States Supreme Court. ■ In *Ryan v. Byram, supra,* 4 Cal.2d 596, 604, our court, quoting at length from Cooley's respected Treatise on Taxation, observed in regard to the directory-mandatory determination that " 'the construction of particular provisions must be left for determination in such light as the obvious purpose they were intended to accomplish may afford. . . . No one should be at liberty to plant himself upon the nonfeasances or misfeasances of officers . . . which in no way concern himself, and make them the excuse for a failure on his part to perform his own duty. On the other hand, he ought always to be at liberty to insist that directions which the law has given to its officers *for his benefit* shall be observed.' " (Italics added.)

In *French v. Edwards* (1872) 80 U.S. (13 Wall.) 506, 511 [20 L.Ed. 702, 703], Justice Field, writing for a unanimous court, drew a similar distinction between statutory procedures which are not related to the protection of individual citizens and those procedures which are designed for an affected individual's benefit. ■ Justice Field wrote: "There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the

---

[5]In *Morris* we pointed out that the dictum in *Gowanlock v. Turner* (1954) 42 Cal.2d 296, 301 [267 P.2d 310] to the effect that "[t]he requirements of a statute are directory, not mandatory, unless means be provided for its enforcement" "is not an accurate expression of the applicable California caselaw on the subject. (See, e.g., *Carter v. Seaboard Finance Co.* [(1949)] 33 Cal.2d 564, 573 [203 P.2d 758].)" (*Morris v. County of Marin, supra,* 18 Cal.3d 901, 910, fn. 5.) To avoid future confusion, we now specifically disapprove this dictum in *Gowanlock*.

requisitions ineffective. Such generally are regulations designed to secure order, system and dispatch in proceedings, and by a disregard of which the rights of parties interested cannot be injuriously affected. Provisions of this character are not usually regarded as mandatory. . . . But when the requisitions prescribed are intended for the protection of the citizen, . . . and by a disregard of which his rights might be and generally would be injuriously affected, they are not directory but mandatory. They must be followed or the acts done will be invalid. . . ."[6]

Under these authorities, the pertinent question in the instant case is whether the statutory requirement at issue was intended to provide protection or benefit to those individuals accused of welfare fraud or was instead simply designed to serve some collateral, administrative purpose.

The People claim that the statutory provision was not enacted for the benefit of those accused of welfare fraud, but rather to advance the financial interests of the state. Emphasizing that the Legislature specifically declined to bar prosecution even when an accused willingly makes restitution, the People tender two explanatory hypotheses for their position that the Legislature intended to protect the state, not its defendants. They argue that the Legislature either concluded that the chances were better to obtain restitution from alleged welfare defrauders if the state sought restitution before it filed criminal charges, or that the Legislature simply desired that the state pursue the less costly efforts for civil restitution before incurring the greater expense of criminal prosecution. In either event, the People assert, the Legislature did not mean to provide any benefit to criminal defendants; hence the state's failure to comply with the statute should not inure to a defendant's benefit.

Although the fiscal considerations suggested by the People may well have played some role in the enactment of the statutory provisions at issue, we believe that the legislation was also designed to provide at least some modicum of protection to individuals accused of welfare fraud.

First, the legislative history of the 1957 enactment, discussed above, suggests that the draftsmen intended the legislation to provide benefits to such individuals. As noted, the bill, as originally introduced, would not only have insured that the state sought restitution prior to bringing a

---

[6]See, e.g., *Holbrook* v. *United States* (9th Cir. 1960) 284 F.2d 747, 752; *Lesser* v. *United States* (2d Cir. 1966) 368 F.2d 306; *Minneapolis Star & Trib. Co.* v. *Commissioner of Tax.* (1970) 287 Minn. 117 [177 N.W.2d 33, 37].

criminal action, but would have permitted a criminal prosecution *only* when the attempt at obtaining restitution proved unsuccessful; this version of the bill was obviously intended to provide protection to those suspected of welfare fraud. Although the Legislature subsequently deleted that portion of the bill that prohibited prosecution whenever an accused made restitution, the Legislature enacted, in essentially the same language as the original draft, the portion that compelled the state *to attempt* to obtain restitution prior to any criminal prosecution. This requirement assured those accused of welfare fraud that they would at least have an early opportunity to make restitution and, thereby, possibly obtain favorable consideration by the prosecuting authorities.

Second, the obligatory nature of the statutory provision also suggests that the section was intended, at least in part, to inure to the benefit of those accused of welfare fraud. If the Legislature had been solely concerned with protecting the public treasury, it would hardly have obligated enforcement officials to seek restitution in every case; instead, it would have simply advised enforcement officials of the advantages of seeking restitution prior to criminal proceedings, leaving the ultimate decision within their discretion.

Third, and finally, the Legislature did not choose to impose the statutory requirement of a prior attempt at restitution with respect to *all* individuals accused of fraudulently obtaining public funds, but instead confined such a procedural requirement to accused welfare defrauders. If the sole legislative motivation had been simply to protect the public treasury, logic would suggest that the prior restitution requirement would have been embodied in a much broader statutory provision, applicable, for example, to officials who improperly embezzle public funds and public contractors who fraudulently obtain unwarranted payments as well as those who improperly obtain welfare benefits. That the draftsmen of the provision eschewed such a generalized approach suggests that the lawmakers believed that those accused of welfare fraud were entitled to particular consideration before criminal proceedings were commenced.[7]

[7]The only comparable statutory provision of which we are aware supports this conclusion. Under section 2113 of the Unemployment Insurance Code, the state is required to notify an individual suspected of fraudulently obtaining unemployment insurance benefits before bringing a criminal prosecution, to enable such individual to demonstrate his willingness to make restitution. (See 50 Ops.Cal.Atty.Gen. 128 (1967).) Although the terms of section 2113 are not identical to the statutory provisions at issue here, taken together, the sections do indicate that as to those suspected of fraudulently obtaining basic subsistence benefits, the Legislature generally believes that willingness to make restitution is a factor to be taken into consideration in determining whether or not to pursue criminal prosecution.

We do not mean to suggest, of course, that the Legislature viewed welfare fraud as a nonserious crime or that the Legislature intended in any manner to condone the conduct of those who obtain excessive welfare benefits through intentional misstatements. The governing statutes impose serious criminal penalties for such fraudulent conduct, and, as noted above, the history of the 1957 legislation reveals that the Legislature was unwilling to guarantee that a welfare fraud defendant who in fact made restitution would escape all criminal prosecution.

By enacting the more modest protections of the final version of the 1957 legislation, however, the Legislature did express its view that in light of the unique circumstances of those receiving welfare benefits, the state ought at least to seek restitution before instituting criminal proceedings. The Legislature was, of course, well aware that welfare benefits to the needy aged, the needy blind and needy dependent children provide such recipients with only the most minimum standard of living, and that, under such circumstances, fraud is often committed simply to obtain foodstuffs and common household items which are viewed as necessities by most members of our society. (Cf. *Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 866 [115 Cal.Rptr. 1, 524 P.2d 97].) While such circumstances would, of course, in no sense legally excuse fraudulent conduct, the Legislature apparently concluded that with respect to these categories of offenses, it is important to insure that enforcement officials make a case-by-case determination of whether the state's interest is adequately served simply by obtaining restitution, or whether criminal prosecution is in fact warranted. The 1957 legislation affords this limited protection to those accused of welfare fraud by requiring the state initially to seek restitution in all cases, while leaving the prosecutor free to determine whether or not criminal proceedings should thereafter be pursued. (Accord 50 Ops.Cal.Atty.Gen. 128, 130-131, *supra.*)

Thus we conclude that the statutory requirement at issue here was intended to provide a measure of protection to individuals suspected of welfare fraud. As we have explained above, the governing authorities establish that when statutory procedures "are intended for the protection of the citizen . . . they are not directory but mandatory. They must be followed or the acts done will be invalid." (*French* v. *Edwards, supra*, 80 U.S. at pp. 506-511 [20 L.Ed. at pp. 702-703].) Accordingly, we conclude that the requirement that the state seek restitution prior to bringing a criminal action under section 11483 should be accorded mandatory

effect, and the state's failure to seek such restitution may be raised by a criminal defendant as a bar to such prosecution.

4. ■ *Because the uncontradicted evidence at trial demonstrates that, prior to the institution of these criminal charges, the state did seek restitution with respect to one of the charged offenses, we reverse the judgment only insofar as it relates to the offense as to which the state did not seek restitution.*

Although we have concluded that the restitution provisions of section 11483 should be accorded mandatory rather than directory effect, we must still determine whether this conclusion dictates the reversal of the entire judgment. Defendants urge complete reversal, relying on the fact that the information failed to allege that restitution had been sought as to either of the charged two fraudulent statements. The People respond that even if the statutory requirement is mandatory, this court should not completely reverse the judgment because uncontradicted evidence established that, prior to instituting these criminal proceedings, the state had in fact sought restitution of the money obtained by defendants pursuant to their initial fraudulent statement.[8] We conclude that under the circumstances the judgment should be affirmed in part and reversed in part.

■ Defendants initially assert that the statutory requirement of a prior attempt at restitution constitutes an "element" of the criminal offense designated by section 11483 which, pursuant to Penal Code sections 950 and 952, must be pleaded. In our recent decision in *In re Sands, supra,* 18 Cal.3d 851, 858, however, we specifically rejected a similar contention, concluding that "the crime of obtaining AFDC aid by misrepresentation or concealment is completed with the taking of the money, not with the state's subsequent demand for the return of the money, and . . . *such demand is therefore not an element of the crime.*" (Italics added.)

Defendants alternatively argue that even if the state's failure to seek restitution constitutes only a defense, rather than an element of the

---

[8]Although under the third count of the information, defendants were charged and convicted of conspiracy, in violation of Penal Code section 182, the People do not contend that the restitution requirement of section 11483 is inapplicable to this count. Because the conspiracy conviction rests directly on the section 11483 offenses, the state should not be permitted to circumvent the statutory restitution requirement simply by bringing criminal charges under Penal Code section 182, rather than under section 11483.

crime, the People should still be required to allege compliance with the statutory requirement in the information. In this regard, defendants rely on a series of decisions which hold that an accusatory pleading must allege that a criminal action has been commenced within the applicable statute of limitation. (E.g., *People* v. *Crosby* (1962) 58 Cal.2d 713, 724 [25 Cal.Rptr. 847, 375 P.2d 839]; *Sobiek* v. *Superior Court* (1972) 28 Cal.App.3d 846, 849 [106 Cal.Rptr. 516].)

As Witkin has pointed out, however, "[t]he statute of limitations in criminal cases is not an ordinary defense." (Witkin, Cal. Criminal Procedure, Proceedings Before Trial, § 204, p. 191.) California decisions treat the failure to bring a criminal action within the applicable statute of limitations as a jurisdictional defect, which may be "raised by demurrer, motion to dismiss, motion to vacate a judgment, or by extraordinary writ, such as habeas corpus. . . ." (*Id.,* at pp. 191-192.) As our recent holding in *Sands* demonstrates, however, the restitution requirement of section 11483 does not rise to such jurisdictional stature. Accordingly, while the state's failure to comply with section 11483's restitution requirement constitutes a procedural defense to a criminal prosecution, we believe that such failure, like most other defenses, need not be specifically negated by the People's accusatory pleading. Thus, the trial court properly overruled defendants' demurrer.

Instead of attacking the state's failure to seek restitution by demurrer, we conclude that defendants should properly have raised the issue by a pretrial motion to set aside the information. Although defendants contend that the question of whether the state has sought restitution under section 11483 prior to instituting the criminal proceedings involves factual questions which must be tried to a jury, we believe that the procedural defense created by the statute is properly resolved by the trial court prior to trial.

In *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44], we faced a similar question of whether a "discriminatory prosecution" defense should be tried to the court or to the jury, and concluded that the trial court should resolve the issue. We noted in *Murgia* that " '[t]he question of discriminatory prosecution relates not to the guilt or innocence of [the accused] but rather addresses itself to a constitutional defect in the institution of the prosecution.' [Citation.] As such, the claim 'should not . . . be tried before the jury . . . but should be treated as an application to the court for a dismissal or quashing of the

prosecution upon constitutional grounds.' [Citation.]" (15 Cal.3d at p. 293, fn. 4.) In comparable fashion, the question of whether or not the state has sought restitution "relates not to the guilt or innocence of the accused" but to the question of a statutory defect in the institution of the prosecution, and hence we hold that the issue is properly resolved by the trial court in passing on a pretrial motion to dismiss.[9]

■ In the instant case, of course, defendants did not press this issue by a pretrial motion to dismiss and ordinarily such a failure would operate as a waiver of this procedural defense. (Cf. Pen. Code, § 996; *People* v. *Gilliam* (1952) 39 Cal.2d 235, 241 [246 P.2d 31].) For several reasons, however, we believe it would be unduly harsh to bar the present defendants from relying on the defense. First, at the time defendants raised this issue by demurrer, *Sands* has not yet been decided and no case held that a prior attempt at restitution need not be alleged in the information. Second, the People did not resist the demurrer on narrow procedural grounds but instead broadly contended that the statutory restitution requirement was permissive and would never constitute a defense to a criminal action. Finally, only in the present opinion have we clearly indicated the propriety of raising and resolving the issue by a nonstatutory motion to dismiss. Under these circumstances, we think it would be unfair to hold that defendants had waived their principal defense. (Cf. *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 716 [135 Cal.Rptr. 392, 557 P.2d 976].)

■ Although we decline to hold that defendants waived the defense, we do believe that the People are entitled to rely on the fact that the uncontradicted evidence presented at trial demonstrates that, prior to bringing these criminal charges, the state did seek restitution "by request . . . or other suitable means" as to the welfare benefits improperly obtained by virtue of defendants' April 19, 1972, false statement. As noted above, the evidence reveals that after welfare officials discovered the initial fraudulent statement, they contacted the defendants and Earnest went to the welfare department, signing a note under which he

[9]Although some early cases intimated that Penal Code section 995 provided the only grounds upon which such a motion might rest, we recognized in *People* v. *King* (1967) 66 Cal.2d 633, 644-645 [58 Cal.Rptr. 571, 427 P.2d 171], that when a statutory provision bars the prosecution of a criminal action, such a statute "cannot be given its proper effect unless it too is recognized as a proper basis for quashing an indictment [or setting aside an information]." (Accord *Murgia* v. *Municipal Court, supra,* 15 Cal.3d 286, 293-294, fn. 4; *Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Coffey* (1967) 67 Cal.2d 204, 215, and fn. 11 [60 Cal.Rptr. 457, 430 P.2d 15].) Applying this reasoning, we conclude that a defendant may raise the state's failure to comply with section 11483's restitution requirement through a pretrial motion to dismiss.

agreed to restore the $338 which defendants had fraudulently obtained. This evidence, in our view, sufficiently demonstrates that the state complied with section 11483 as to the criminal charges arising out of the April 19, 1972, statement.[10] Accordingly, we conclude that the judgment should be affirmed insofar as it relates to such conduct.

The People, however, presented no evidence that the state had similarly attempted restitution as to the funds improperly received as a result of the defendants' failure to disclose the income received from Evelyn's employment in February 1973. The People now suggest that in light of Earnest's earlier failure to keep up with his restitution payments the state could reasonably have concluded that any such attempt at obtaining restitution would have been futile. The state, nevertheless, under the terms of section 11483 is obligated to give all persons accused of AFDC fraud at least some opportunity to make restitution prior to bringing a criminal action; the statute contains no proviso excusing compliance whenever enforcement officials believe that such an attempt will fail. Accordingly, we conclude that the judgment of conviction should be reversed insofar as it relates to the fraudulent conduct of February 14, 1973.

We affirm the convictions arising out of count one and count three of the information. We reverse the conviction arising out of count two. The order granting probation is vacated and the case is remanded to the trial court so that it may determine whether the conditions of probation heretofore imposed should be modified in light of the conclusions of this opinion.

Bird, C. J., Mosk, J., Clark, J., Richardson, J., Manuel, J., and Sullivan, J.,* concurred.

---

[10]We reject defendants' contention that the state's efforts to obtain restitution were insufficient to satisfy the statutory requirement because the state failed to follow up its initial action with further reasonable efforts to obtain restitution, including the filing of a civil action. As we have seen, the relevant statutory language clearly provides that "restitution shall be sought by request, civil action, *or* other suitable means" (italics added) and thus we conclude that the state's simple "request" for restitution satisfied the statutory mandate.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.