[Crim. No. 31786. Second Dist., Div. Four. Oct. 26, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
MARILYN DAVIS, Defendant and Appellant.

COUNSEL

Roblin J. Williamson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General,

Norman H. Sokolow and Linda C. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**JEFFERSON (Bernard), J.**—By an information filed in 1973, defendant Marilyn Davis was charged in case No. A183720, with committing the offense of fraudulently obtaining financial aid in excess of $200 from the County of Los Angeles for nonexistent children in violation of Welfare and Institutions Code section 11483.[1]

Defendant entered a plea of not guilty, and then withdrew that plea and pleaded nolo contendere. Defendant personally waived her right to a jury trial, the right to confront witnesses and the right to present witnesses on her own behalf.[2] Counsel joined. Defendant was granted probation.

By an information filed in 1974, defendant was charged, in case No. A311120, in count I, with committing the offense of grand theft, a violation of Penal Code section 487. In count II, defendant was charged with committing the offense of fraudulently obtaining financial aid for children Reginald Patterson, Janell Patterson, Vermitia Patterson and Joseph Patterson, in excess of $200, when said children were not in fact eligible for such aid, in violation of Welfare and Institutions Code section 11483.

Defendant entered a plea of not guilty. The case was called for trial on November 4, 1975. Defendant personally and her counsel waived trial by

---

[1] That section then read as follows: "Whenever any person has, by means of false statement or representation or by impersonation or other fraudulent device, obtained aid for a child not in fact entitled thereto, the person obtaining such aid shall be punished as follows: [¶] (1) If the amount obtained or retained is two hundred dollars ($200) or less, by imprisonment in the county jail for a period of not more than six months, a fine of not more than five hundred dollars ($500), or both such imprisonment and fine. [¶] (2) If the amount obtained or retained is more than two hundred dollars ($200), by imprisonment in the state prison for not less than one year or more than 10 years or by imprisonment in the county jail for not more than one year. [¶] All actions necessary to secure restitution shall be brought against persons in violation of this section as provided in Sections 12250 and 12850."

The section was amended by Statutes 1977, chapter 165, section 95, to delete "for not less than one year or more than 10 years."

[2] The record shows that defendant did not personally waive her right relative to compulsory self-incrimination.

jury. Defendant's motion to dismiss count I of the information, pursuant to Penal Code section 995, was denied. Trial commenced on November 14, 1975. Defendant was represented by an attorney who appeared on her behalf, pro bono.[3]

After trial had commenced, the information was amended to allege that defendant had suffered five prior felony convictions. Defendant was rearraigned and denied the priors.

Trial in this matter was not completed until June 14, 1977, some *19 months* after the trial had begun; proceedings were held on at least *19* different occasions during this period. Continuances of trial were obtained by defendant for a variety of reasons, among which were her illness, her failure to appear, her counsel's failure to appear due to other commitments, his illness, and for other reasons not apparent in the record.

Defendant was found not guilty as to count I of the information, and guilty as to count II. The court found three of the allegations of prior felony convictions to be true, and two untrue. During her lengthy trial, defendant was charged with violating her probation in case No. A183720, due to her failure to appear for proceedings in the second case. The probation violation matter was continued so that it would trail proceedings in case No. A311120.

On August 19, 1977, defendant was sentenced in both cases to state prison for the terms prescribed by law, the sentences to be served concurrently.

Defendant has filed a notice of appeal which purports to appeal from the judgments rendered in both cases.

With respect to the judgment rendered in 1973 in case No. A183720, her purported appeal therefrom has not been filed in timely fashion (Pen. Code, § 1237), as her court-appointed appellate attorney concedes. Defendant has written a letter to this court, filed on June 7, 1978, in which she attempts to raise the issue of less than full advisement of the consequences of her waiver of rights in making a plea of nolo contendere in the first case; we may not consider that issue here. Neither defendant nor her appellate counsel has raised any issue claiming impropriety in the

---

[3]Nothing in the record before us explains why defendant was not represented by either the public defender or count-appointed counsel.

revocation-of-probation proceedings of the first case. The appeal from the judgment rendered in case No. A183720 must therefore be dismissed.

What remains before us is the appeal from the judgment rendered in the second case—case No. A311120. Our discussion will concern the issues raised by defendant's appellate counsel in his opening and supplemental opening briefs and an issue discussed in oral argument followed by written points and authorities submitted by the parties.

I

*The Factual Background*

Defendant was convicted on count II of the information, of fraudulently obtaining aid to families with dependent children (hereinafter, AFDC) for four nonexistent children—Reginald, Janell, Vermitia and Joseph Patterson. Thus, the burden placed on the prosecution at trial was to establish a negative fact—the nonexistence of the claimed-to-exist four Patterson children. Much of the evidence adduced below was circumstantial and directed toward the resolution of this crucial factual issue.

It appears that defendant, using the name Marilyn Patterson, contacted the Department of Public Social Services of the County of Los Angeles (hereinafter, DPSS) in March 1974, by telephone, requesting a home call to her Los Angeles address on Stanley Avenue to discuss an AFDC application. DPSS worker McNeal testified that she visited defendant at the latter's home and commenced processing the application.

No children were seen by McNeal, but defendant advised her there were four Patterson children although there would be some difficulty in verifying the births of the children in Texas. Thereafter, defendant was issued aid under the AFDC program.

Warrant Investigator Ferrell testified that warrants were paid by Los Angeles County to defendant as Marilyn Patterson from April 1974, to July 1974, for AFDC, and additional warrants were issued to defendant as Marilyn Davis for general relief, a form of county assistance which is distinct from AFDC, during the same time period.

Witness Fraser, an examiner of questioned documents for the Los Angeles Sheriff's Department, testified that, after comparison of various prosecution exhibits, *i.e.*, the defendant's welfare applications and the

warrants paid by the county after endorsement by the payee, he was of the opinion that the signatures under study had been executed by the same individual.

Sometime in June or July 1974, the DPSS was alerted to the possibility of welfare fraud by defendant. DPSS fraud investigator Mary Zervas testified that she interviewed the defendant in July 1974, concerning verification of the births of the Patterson children alleged to exist in defendant's application for aid. Defendant apparently submitted documentation to prove that the births had occurred in Texas; but subsequent contact by Zervas with Texas authorities led Zervas to conclude that the named Patterson children were nonexistent. Mary Zervas sent letters to defendant in August and September 1974, asserting that defendant had fraudulently received assistance from Los Angeles County in the amount of $2,111.90 by making material misrepresentations.

On the Patterson AFDC application, defendant had given birthdates for the four children, including 1968 for Janell, 1969 for Vermitia and 1970 for Joseph. Landlord Jack Ritof testified that he had rented premises to defendant at 1606 Century Boulevard in Los Angeles from May 1967, to December 1973. He stated that defendant had never appeared pregnant to him although he had seen her often during the better than five years tenancy; no children were seen by him at the Century address. Roland Griggs, a former tenant at the South Stanley address where defendant resided from December 1973, to July 1974, testified that he had never seen any children in residence there.

Counselor Glenn testified that she had been employed by the California Institution for Women as a counselor in September 1973; there she had significant contacts with defendant; defendant advised her that she was single and childless.

Dr. Leroy Weekes, an obstetrician and gynecologist in Los Angeles, testified that he had performed surgery on defendant in June 1970; he remembered the defendant as a woman with "a large fibroid tumor [who] was very desirous of having children." Dr. Weekes stated that defendant was not pregnant during any time while under his care.

DPSS worker Slotnick testified that she had various contacts with defendant in 1971 and 1972, and knew her as Linda Caldwell, an AFDC mother supposedly with one child—a child Slotnick never saw in two or three home visits.

DPSS fraud investigator Moody testified that he had investigated defendant on prior occasions and knew her under various names as Linda Caldwell, Marilyn Davis, Carmen Bledsoe and Marilyn Patterson.

DPSS worker Slatter testified that she had processed an AFDC application for defendant in 1975; that defendant represented herself to be Allie Lewis with young children. Defendant advised Slatter that she did not have birth certificates for the Lewis children.

Slatter's supervisor at the DPSS, Davis, testified that she had had several conversations with defendant at the DPSS office regarding birth verifications for the Lewis children, but was told by defendant that the Lewis children had been born in Texas to defendant and a married man and that the birth records were sealed. Defendant had agreed to try to obtain verification, but none was ever forthcoming. Neither Slatter nor Davis ever saw the Lewis children and, when no verification was presented, AFDC aid was terminated.

DPSS worker Gratigny testified that she had several contacts with defendant as Lisa Richardson, an applicant for AFDC aid in 1975. Gratigny had made a home call at a motel in Long Beach, and had seen three children sleeping in bed. Defendant told Gratigny the children had been born in Texas and gave Gratigny some birth verification information.

DPSS worker Smith testified that she had contact with defendant as Carmen Bledsoe in February 1976 (while this trial was in progress). Defendant sought aid for four children, producing baptismal certificates in an office visit. Smith never saw the children, but processed an application by defendant for children under the names of Morse and Marshall.

Defendant testified in her own defense, asserting that she had given birth to the four Patterson children; that the father was Larry Patterson. According to defendant, the children had been born in Texas, with the assistance of a midwife, now deceased. The children had spent most of their lives in Texas but had been in California in 1974 or 1975, when their father came and took them back to Texas. Defendant introduced letters from the Texas State Department of Health to indicate that, since 1974, defendant had been attempting to obtain delayed certificates of birth for these children. Defendant denied that she had ever applied for aid as

Richardson, Lewis or Bledsoe; she also declared that she had a friend from Texas named Linda Caldwell who did in fact exist.

II

### Does Welfare and Institutions Code Section 11483 Make It a Crime to Obtain Aid for a Nonexistent Child by Falsely Representing That Such Child Exists?

■ The prosecution's evidence in the case at bench established that defendant had secured financial aid from the County of Los Angeles by falsely representing that she was the mother of four children who were in need of aid, when in fact such children never existed and she was childless.

Welfare and Institutions Code section 11483 makes it a crime whenever any person "has, by means of false statement or representation or by impersonation or other fraudulent device, *obtained aid for a child not in fact entitled thereto.*" (Italics added.) A literal interpretation of this statute covers only the fraudulent securing of aid for an *existing* child not in fact entitled to aid. But if section 11483 were to be given a literal or plain-meaning interpretation, it would not have the result that a false representation with respect to the existence of a child would go unpunished. Obtaining county aid by such a false representation would be punishable under the general theft statutes—Penal Code section 484 et seq.

No case from our appellate courts has been called to our attention that interprets Welfare and Institutions Code section 11483 with respect to the factual situation presented by the case before us. ■ We know of no principle of statutory construction which requires that, under all circumstances, words of a statute should be construed according to the plain or literal meaning of those words. On the contrary, a persuasive and basic principle of statutory construction provides that legislative intent should prevail over a literal or plain-meaning construction. This legislative-intent principle of statutory construction was set forth with emphatic clarity in the fairly early case of *In re Haines* (1925) 195 Cal. 605 [234 P. 883]. The *Haines* court stated: " 'The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are sufficiently

flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act . . . .' " (*Id.*, at p. 613.)

An important guide to legislative intent is legislative history. We turn then to legislative history in an effort to determine whether the Legislature intended for Welfare and Institutions Code section 11483 to cover false representations regarding the very existence of children as well as false representations regarding the need for aid to existing children such as deceptions regarding income or the father's whereabouts.

As originally enacted in 1965, section 11483 of the Welfare and Institutions Code was not a penal statute. It provided only that the defrauding person should make restitution and authorized all actions against such a person necessary to secure restitution.[4] At the same time, Welfare and Institutions Code section 11482 provided: "Any person other than a needy child, who willfully and knowingly, with the intent to deceive, makes a false statement or representation or knowingly fails to disclose a material fact to obtain aid, or who, knowing he is not entitled thereto, attempts to obtain aid or to continue to receive aid to which he is not entitled, or a larger amount than that to which he is legally entitled, is guilty of a misdemeanor."

In *People* v. *Gilbert* (1969) 1 Cal.3d 475 [82 Cal.Rptr. 724, 462 P.2d 580], the court held that there was a conflict between the general penal statute of Penal Code section 484, the theft statute, and the specific statute—the welfare fraud provisions of Welfare and Institutions Code section 11482. The *Gilbert* case held that the specific statute had to prevail, with the result that welfare fraud perpetrators could only be punished as misdemeanants under Welfare and Institutions Code section 11482 even though the amounts obtained would constitute grand theft, a felony, under the provisions of Penal Code section 484 et seq.

In response to the *Gilbert* decision (see *People* v. *Faubus* (1975) 48 Cal.App.3d 1 [121 Cal.Rptr. 167]), the Legislature amended Welfare and

[4]The 1965 version of Welfare and Institutions Code section 11483 provided: "Whenever any person has, by means of false statement or representation or by impersonation or other fraudulent device, obtained aid for a child not in fact entitled thereto, the person obtaining such aid shall make restitution and all actions necessary to secure restitution may be brought against him."

Institutions Code section 11483 to make it a penal statute and to make a violation thereof a felony or misdemeanor dependent upon the amount obtained ($200 being the dividing line) as aid "for a child not entitled thereto." By converting Welfare and Institutions Code section 11483 into a penal statute and leaving section 11482 intact, the Legislature seems to have confirmed the *Gilbert* analysis of the legislative scheme to require all welfare fraud offenses to be prosecuted under the Welfare and Institutions Code. Can section 11483 be reasonably interpreted to apply to false representations that a child is in existence and in need of aid in conformity with the legislative intent that all welfare fraud offenses be prosecuted under the Welfare and Institutions Code? We conclude that the language of section 11483 is "sufficiently flexible" (see *In re Haines, supra,* 195 Cal. 605, 613) to admit of a nonliteral construction to effectuate the legislative scheme. ■ We thus construe section 11483 to cover false representations to obtain aid for a nonexistent child as well as such representations to obtain aid for an existing child not entitled to such aid. Both situations come within the basic purpose of Welfare and Institutions Code section 11483—to punish adults who secure governmental aid by making false representations that such aid is for children who are in need of such aid.

## III

### Must Restitution First Be Sought From Defendant as a Condition Precedent to Prosecution Under Welfare and Institutions Code Section 11483?

■ Defendant asserts that her conviction should be reversed because the prosecution failed to produce at trial evidence that restitution had been sought from her before criminal charges were filed against her. Defendant relies upon the California Supreme Court's ruling in *People* v. *McGee,* 19 Cal.3d 948 [140 Cal.Rptr. 657, 568 P.2d 382], decided September 19, 1977.

Welfare and Institutions Code section 11483 (see fn. 1) makes reference to restitution efforts required by then effective companion Welfare and Institutions Code sections 12250 and 12850. In those sections, since repealed, it was stated: "It is the intent of the Legislature that restitution shall be sought by request, civil action, or other suitable means prior to the bringing of a criminal action."

In *In re Sands* (1977) 18 Cal.3d 851 [135 Cal.Rptr. 777, 558 P.2d 863], the California Supreme Court held that a welfare recipient convicted of a violation of section 11483 could not attack that conviction by a writ of habeas corpus on the ground that the prosecution had failed to seek restitution prior to prosecution. This decision was rendered while defendant's trial was in progress.

In *People* v. *McGee, supra,* 19 Cal.3d 948, decided a month after defendant's conviction, the same issue was considered by the court on appeal from the judgment. The conviction of Evelyn McGee was reversed on the ground that no effort had been made to obtain restitution on the illegally obtained aid prior to the filing of the criminal charges against the McGees. Noting that *Sands* had held that the restitution requirement need not be proved as an element of the crime of welfare fraud, nor was it a defense to the crime, the *McGee* court nevertheless termed the statutory requirement mandatory and that failure to meet it bars prosecution. The *McGee* court holds that the appropriate method by which a defendant avails himself of this procedural defense is by a nonstatutory pretrial motion to set aside the information.

The rationale for reversal of the judgment of conviction as to one count in *McGee,* even though the defendants had not made a pretrial motion to dismiss the information, was expressed as follows: "In the instant case, of course, defendants did not press this issue [of restitution attempts] by a pretrial motion to dismiss and *ordinarily* such a failure would operate as a waiver of this procedural defense. [Citation.] For several reasons, however, we believe it would be unduly harsh to bar the present defendants from relying on the defense. First, at the time defendants raised this issue by demurrer, *Sands* has [*sic*] not yet been decided and no case held that a prior attempt at restitution need not be alleged in the information. Second, the People did not resist the demurrer on narrow procedural grounds but instead broadly contended that the statutory restitution requirement was permissive and would never constitute a defense to a criminal action. Finally, only in the present opinion have we clearly indicated the propriety of raising and resolving the issue by a nonstatutory motion to dismiss. *Under these circumstances,* we think it would be unfair to hold that defendants had waived their principal defense. [Citation.]" (*McGee, supra,* 19 Cal.3d 948, 968, italics added.)

We need not determine whether the *McGee* court intended to compel the reversal of the convictions of all defendants similarly charged and convicted before that ruling on the ground that the newly recognized

procedural defense should not be held to have been waived by the failure of such defendants to have raised the defense properly in the trial courts. In *McGee,* the court sustained the defendants' convictions of two counts of welfare fraud even though there had been no pretrial motion to dismiss and even though the failure to make such a motion was not considered a waiver of the defense under the circumstances. The *McGee* court reasoned: "Although we decline to hold that defendants waived the defense, we do believe that the People are entitled to rely on the fact that the uncontradicted evidence presented at trial demonstrates that, prior to bringing these criminal charges, the state did seek restitution 'by request . . . or other suitable means' as to the welfare benefits improperly obtained by virtue of defendants' April 19, 1972, false statement [as charged in two of the counts]." (*McGee, supra,* 19 Cal.3d 948, 968.)

In the case at bench, no effort was made by this defendant at trial, either by demurrer or other pretrial procedure, to raise the defense of failure by the state to seek restitution. But had such a defense been raised, it would have been fruitless as evidence produced by the prosecution was sufficient to negate any such defense. As early as July 1974, defendant had discussed her situation with Investigator Zervas. On August 8, 1974, the first of three letters pertaining to the county's claim that defendant was under obligation to make restitution was sent by certified mail to defendant's address as known to DPSS—820 S. Stanley Ave., Los Angeles, California.

The August 8 letter read: "As a result of an investigation into your entitlement to public assistance, the Department of Public Social Services is of the opinion that you were overpaid in the amount of $1,348.00 during the period April 1, 1974 to July 31, 1974. This overpayment was caused by your material misrepresentation. [¶] Under the provisions of the Welfare and Institutions Code Section, it is necessary that you contact the undersigned Welfare Investigator before August 22, 1974 to discuss a plan to make restitution of this overpaid amount. [¶] No additional notice will be sent to you concerning this matter. We will consider your failure to answer this notice as a sign of your unwillingness to make restitution or to discuss any such plan for restitution." This letter was signed by Mary C. Zervas, Welfare Investigator. This letter was returned to DPSS by the postal authorities with the notation "Unclaimed."[5]

---

[5]A second letter was sent to another address on Stanley Avenue which DPSS had discovered as a possible address of defendant but it was also returned unclaimed.

Although there has been no definitive ruling on what form the governmental attempt to obtain restitution must take, it seems clear that the institution of a lawsuit is not required. The *McGee* court stated that a "simple request" for restitution satisfies the statutory requirement. (See *McGee, supra,* 19 Cal.3d 948, 969, fn. 10.) We hold that, in light of the *McGee* court's view, the DPSS's letter of August 8, 1974, informing defendant that she had been overpaid $1,348 by her material misrepresentation and requesting that she "contact the undersigned Welfare Investigator before August 22, 1974 to discuss a plan to make restitution of this overpaid amount" satisfied the statutory requirement that the government seek restitution as a condition precedent to prosecution for welfare fraud. Criminal prosecution of defendant was not commenced until September 19, 1974.

IV

*The Contention That Defendant Was*
*Denied a Fair Trial Because of the*
*Inadequacy of Trial Counsel*

Defendant contends that her conviction should be reversed because of the inadequacy of her trial counsel which caused her to have less than a fair trial.

It is well settled that the right of a criminal defendant to the assistance of effective counsel is one of constitutional dimension; if it is demonstrated that a trial attorney's inadequacy has reduced a trial to a "farce and sham," the defendant's conviction will be reversed. (*People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].) Following the declaration of this principle in *Ibarra,* some definitive guidelines have evolved in the case law concerning the proper approach for assessing the contention defendant has made here.

The burden is on the defendant to demonstrate trial counsel's inadequacy as an actual fact. (*People* v. *Reeves* (1966) 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35].) Defendant must show that the incompetence of counsel was based upon a lack of knowledge of the law, or a lack of preparation and investigation of the case, which resulted in the withdrawal of a crucial defense from consideration at trial. (*In re Saunders* (1970) 2 Cal.3d 1033 [88 Cal.Rptr. 633, 472 P.2d 921].) Further, defendant must establish that the conduct of counsel—whether consisting of affirmative acts or omissions—was not attributable to trial tactics,

however ineffective such conduct proved to be after the fact. (*People* v. *Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Jenkins* (1975) 13 Cal.3d 749 [119 Cal.Rptr. 705, 532 P.2d 857].)

On this appeal, defendant concedes that the circumstances under which her trial was conducted do not fall within any of the established categories of conduct which has been found incompetent in the decisional law. However, she argues that the entire record demonstrates a basic lack of commitment to her case by her trial attorney, resulting in an accumulation of errors which deprived her of a fair trial.

It is true, as defendant concedes, that her trial took place over a period of *19 months* when only a few weeks were required at best, and that many of the court sessions were of extremely short duration. We have no doubt that this situation placed an unusual burden on the trial court. This is demonstrated by the fact that, long after the trial had commenced, the trial court asked the prosecution to submit a trial brief detailing the charges against the defendant. The prosecution did submit such a brief, and the trial court indicated that the brief had effectively clarified the issues.

Our analysis of the record below reveals that there were many continuances sought by defendant which extended the length of this trial. They were obtained for reasons attributable to defendant's personal situation. Several lengthy continuances were necessary due to defendant's illnesses. It is also clear that defendant's pro bono attorney was under too heavy a burden of other courtroom commitments to be of assistance to the trial court in moving defendant's case along. Possibly because of his pro bono *status*, defense counsel was given unusual latitude in scheduling sessions relating to this trial. It thus appears that a combination of factors resulted in an interminable trial.

Defendant has specified a number of instances during trial which she contends establish the asserted incompetence of her trial attorney. She points out, for example, that no objection was made by her counsel to the introduction of much evidence relating to defendant's applications for aid on other occasions before and after the criminal prosecution in the instant matter—evidence very prejudicial to defendant. We point out, however, that since Welfare and Institutions Code section 11483 deals with a specific intent crime, the evidence of which defendant complains was properly admitted on the ground that it was relevant to the issue of defendant's *intent* in making the AFDC application for the Patterson

children, and thus constituted one of the exceptions to the evidentiary principle precluding admissibility to character trait or propensity evidence. (Evid. Code, § 1101, subd. (b).)

Defendant also argues that her trial counsel's courtroom response to the "search and seizure" issue raised during trial was less than precise. It appears that, during trial, the prosecution sought and obtained search warrants for defendant's home and defendant's personal papers in her possession while she was in the county jail. Defense counsel objected to the seizure of defendant's personal papers on the ground that it was immune under the attorney's work-product privilege. The trial court rejected this argument. The record reveals that thereafter the issue of what had been taken from the defendant, and what had been returned to her, pursuant to court order, was rehashed many times in court. It is true that defense counsel, although he announced his intention to pursue the matter, did not insist on a hearing to challenge the search and seizure by the particular officers involved. It may be that trial counsel did determine, after investigation, that there was no legal basis for such a challenge. We simply cannot engage in speculation on the basis of the record before us.

Defendant complains that the presentation of her defense was made in a less than a professional manner. She specifically argues that, when she testified, she was primarily asked to identify for introduction into evidence numerous records which the prosecution regarded as relevant to her case. At no time was she asked direct questions by her attorney with the purpose of eliciting facts relevant to her defense. We cannot eliminate the possibility that counsel was engaged in a preconceived plan, *i.e.,* trial tactics, regardless of how ineffective they proved to be.

Defendant calls our attention to the fact that she herself was allowed to cross-examine Welfare Investigator Mary Zervas, a witness for the prosecution; that this cross-examination produced little relevant testimony; and that this circumstance demonstrated the ineffective representation she was receiving at trial. The record reveals that the trial court did allow defendant to participate in cross-examining the prosecutor's witness, Mary Zervas, upon defendant's counsel's representation to the court that defendant knew more about the matter than he did. This remark is subject to a number of interpretations, but it is clear from the record that defendant, possibly for a variety of reasons, saw herself as an active participant in the legal process. Such active participation does not necessarily establish the incompetence of defense counsel.

Finally, defendant alludes to her counsel's statement in argument that he may have been "cavalier" in presenting evidence on defendant's behalf. Taken in complete context, however, counsel made the argument that the prosecution had failed to prove defendant's guilt.

We reiterate that the standard for adequacy of counsel representation is not that defendant is entitled to an errorless trial, but rather to an effectively conducted trial. We note in this regard that defendant was found not guilty on count I. We note also that the proceedings were conducted less formally than is usually the case, but due in part to defendant's own requests. We conclude that defendant has not demonstrated that she received less than a fair trial or that her counsel was ineffective in representing her.

The appeal from the judgment in case No. A183720 is dismissed. The judgment in case No. A311120 is affirmed.

Files, P. J., and Alarcon, J., concurred.